**Ariana Denley, OSB #173314**
**adenley@eugenelaw.com**
HUTCHINSON COX
940 Willamette Street, Suite 400
Eugene, OR 97401
Telephone: (541) 686-9160
Facsimile: (541) 343-8693

**Bruce A. Kaser, WSBA #13532**
**bruce@vantagelaw.net**
VANTAGE LAW, PLLC
414 NE Ravenna Blvd.
Ste A-1243
Seattle, WA 98115
Telephone: (206) 909-7928
*(pro hac vice pending)*

Of Attorneys for Pratum Farm, LLC

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **PRATUM FARM, LLC,**<br><br>    Plaintiff,<br><br>  vs.<br><br>**UNITED STATES DEPARTMENT OF AGRICULTURE,**<br><br>    Defendant. | Case No.:<br><br>**COMPLAINT FOR RELIEF UNDER THE ADMINISTRATIVE PROCEDURE ACT (5 U.S.C. § 706)** |

Plaintiff Pratum Farm, LLC ("Pratum Farm") brings this action under the Administrative

Procedure Act ("APA") to challenge certain parts of Defendant United States Department of

Agriculture's ("USDA") final rule called "Strengthening Organic Enforcement" ("SOE"), made

effective on March 20, 2023.

## INTRODUCTION

1.

In this action, the Court will be asked to decide the following issue as a matter of law:

> When a federal statute requires an annual third-party certifier
> inspection of every farm that is to be certified as an "organic"
> crops operation, can the USDA adopt a final rule that calls for
> limited "spot checks" of a nominal number of farms in a group of
> independently owned and operated farms?

2.

An advance draft copy of this complaint was provided to certain trial staff at the USDA on August 31, 2023, for prefiling comment and/or to give the USDA an opportunity to dispute, deny, or correct any factual or legal allegations set forth in this complaint prior to filing in this Court. As of the date of filing this Complaint, no response has been received from the USDA.

## JURISDICTION AND VENUE

3.

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under federal law.

4.

Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1) because Plaintiff resides in Marion County, Oregon. As of the filing date of this complaint, Plaintiff conducts no business activities outside the state of Oregon, other than purchasing certain equipment and supplies from out-of-state or out-of-country suppliers and using certain out-of-state institutions for financing.

## PARTIES

5.

Plaintiff Pratum Farm is a family-owned Oregon LLC located at 120 95th Ave NE, Salem, OR 97317.  Pratum Farm was formed in 2004 and since then has operated continuously as a farm

business in Marion County, Oregon. Pratum Farm has been involved in the Oregon hazelnut industry since 2004.  Pratum Farm commenced transitioning to organic hazelnut operations in 2019. Pratum Farm now has approximately 55 acres of hazelnut orchards that are either certified as organic or in transition to certification.

6.

Defendant USDA is a federal agency headquartered in Washington, D.C., at 1400 Independence Avenue S.W., Washington, D.C. 20250.

7.

The USDA administers the National Organic Program ("NOP") under the direction of the USDA's Agricultural Marketing Service ("AMS"), pursuant to the Organic Foods Production Act, 7 U.S.C. § 6501 *et seq.* The AMS administers programs intended to create domestic and international marketing opportunities for U.S. producers of food, fiber, and specialty crops. As a federal regulatory program that operates under the purview of the AMS, the NOP creates national standards for organic agricultural products sold in the U.S. The NOP also accredits third party organic certifiers to act as NOP agents and makes policies for certifying organic farm and handler operations. Last, the NOP operates in collaboration with the National Organic Standards Board ("NOSB"). The NOSB is a federal advisory board staffed by 15 public volunteers that makes nonbinding recommendations to the NOP concerning organic regulations.

8.

The Deputy Administrator of the NOP is the federal officer who is personally responsible for compliance with certain relief requested below, pursuant to 5 U.S.C. § 702.  Currently, the Deputy Administrator of the NOP is Dr. Jennifer Tucker.

## FACTUAL ALLEGATIONS

**A.    The 2% Rule**

9.

The Organic Foods Production Act of 1990 ("OFPA") requires a USDA-accredited, third-party certifying agent ("certifier") to conduct an annual, on-site inspection of every farm that is certified "organic."  7 U.S.C. § 6506(a)(5) (the "OFPA inspection statute").  The relevant part of the OFPA inspection statute is set forth in ¶ 158, *infra*.

10.

Ignoring the above requirement, SOE final rulemaking involved amending the earlier version of 7 CFR § 205.403 to enact a new rule that uniquely favors foreign agribusinesses. The new rule calls for accredited certifiers to only do "spot check" inspections of a small percentage of foreign farms in a group of independently owned and operated farms (commonly called a "grower group"), leaving inspection of most of the farms to an unaccredited "self-inspection" by means of an honor system ("the 2% Rule"). 7 CFR § 205.403(a)(2)(iii) (paragraph (a)(2)(iii) added by SOE rule amendment). The relevant part of rule 205.403(a)(2) is set forth in ¶ 159, *infra*.

11.

The 2% Rule includes "spot check" math that has built-in complications. The rule requires spot checking at least "1.4 times the square root or 2%" of the "total number of producer group members" – with the rule having new definitions in 7 CFR § 205.2 that, among other things, calls for the "producer group member" to be "an individual" who is engaged in producing agricultural products as a member of a "producer group operation."

12.

The business organization and geographical boundary lines of the "producer group operation" are intentionally left open-ended for the accredited certifier to define on a discretionary

basis. It can be any combination of nonfarmer or farmer individuals, partnerships, corporations, associations, cooperatives, or "other entity." *See* 7 CFR § 205.2. It can include a mixed collection of food processors, traders, marketers, regional collection warehouses or other collection sites, farmers, and other individuals or entities involved in the farm-to-processor chain – all considered to be in the same "grower group," if a certifier chooses to define it that way.

13.

Adding to the above complexities, the certifier has the discretion to decide which "individuals" within the group need to be checked, with the added discretion to focus on some more than others, according to a list of twenty (20) "risk factors." *See* ¶¶ 64-69, *infra.* This means that some individuals selected for certifier inspection may work in the office of a food processor that controls the group (food processor control is a common practice), some individuals may work at a crop collection warehouse or similar collection point, some may work in other offices, and some may be individual farmers – so long as the "1.4 times the square root or 2%" numbers are collectively met according to the certifier's way of calculating things.

14.

In addition to doing the spot checking, the certifier reviews, in either the certifier's office or at the headquarters of a food processor, a "written plan" that calls for "self-inspection" of the remaining uninspected entities of the group (*i.e.,* nearly all the farms) – based on an honor system – with the self-inspection being done by food processor employees (or other persons involved in the group) called "internal inspectors." The certifier accepts the "written plan" for self-inspection as a proxy in lieu of the certifier visiting and inspecting farms.

15.

Under this honor system, the "internal inspectors" supposably go to farms and do inspections and the other things an accredited certifier is supposed to do – purportedly at the same level of expertise and thoroughness as an accredited certifier. Although the OFPA inspection statute requires otherwise, none of the "internal inspectors" are accredited for organic inspections by the NOP.

16.

The spot check/honor system described above is labeled the "Internal Control System" (or "ICS") by the NOSB, the NOP, foreign certifiers, and others.

17.

In the most common form of grower group, a food processor pays for all the organic certification costs, but at a highly discounted rate created by the 2% Rule – because the food processor does not have to pay the accredited certifier to visit and write reports on each farm in the group (or other entities) at a paid hourly rate. The certifier issues the organic "crops" certificate to the food processor only.

18.

The 2% Rule does not require group profit sharing or any kind of common or shared control – such as the shared control that is typical to a written partnership agreement, a jointly owned corporate or limited liability ("LLC") entity, or a jointly owned marketing or trading company.

19.

The 2% Rule does not require any kind of cooperative-like relationship among the farmers themselves (*e.g.,* a farmer owned cooperative entity that pays farmer dividends). All can be individual farmers who operate independently of each other.

20.

For the first time, the 2% Rule partially formalizes, in a written rule, a mutation of USDA/NOP policies that has existed for decades outside of both OFPA statutes and the Code of Federal Regulations ("CFRs"). This mutation parallels a shift in the organic industry from farmers selling directly into the organic marketplace to agribusinesses selling "organic" into the mainstream marketplace. This mutation and shift have led to, among other things, an expansion in the size of the "organic" section in supermarket chains.

21.

As indicated above, the 2% Rule is a uniquely foreign practice. It favors agribusinesses that are largely involved in the importation of coffee, bananas, cocoa, and similar tropical crops into the United States ("U.S.") from Latin America, Asia, and Africa.

22.

Today, the 2% Rule primarily serves to (1) reduce costs for foreign and/or multi-national agribusinesses that want to use the USDA organic seal and (2) debase the overall integrity of the U.S. organic system in the U.S. domestic market.

B.     **The History of "Grower Group" Certifications Leading Up to the 2% Rule**

23.

"Grower group" certifications precede the OFPA and arose during a time period when there was no governmental control over organic certification. In that era ("the unregulated era"), organic "certifiers" were self-appointed, private organizations that operated under their own rules and set their own standards for organic certification.

24.

According to a March 2019 study carried out by the Research Institute of Organic Agriculture (aka "FiBL"), grower group certifications were conceived in the 1980s by

unregulated certifiers who were looking to certify organic agricultural crops grown by small landowner farmers in low-income countries ("smallholders").

25.

The FiBL study states:

> The initial focus was on coffee and cocoa cooperatives with very small-scale, and often illiterate, producers, each farming only several acres of land. Individual certification of each such tiny farms *[sic]*, often in very remote areas was prohibitive not only in terms of costs, but also due to a lack of administrative and management skills.

*See Group Certification*, pp. 11-15, Research Institute of Organic Agriculture (FiBL) (2019) (supported by the Swiss Confederation).

26.

Therefore, for reasons relating to costs and other impracticalities, there was an early belief that it was unworkable for third-party certifiers to inspect each farm in an agricultural system of the above kind.

27.

In the unregulated era, the certifier-developed solution to the above problem was "group certification" that involved a certifier "spot-checking" a small sampling of individual farmers who were in a designated cooperative group in the same location (*i.e.,* all in the same small town or village), rather than inspecting all of them. This purportedly enabled all the farmers in the group to pool their money to pay for the certifier, but overall certification costs were reduced because the certifier did not visit most of them. In the unregulated era, there were no government statutes or rules that approved or disapproved of these practices. There were also no guidelines as to how many farms should be "spot checked" – leaving it to the discretion of the certifier based on the certifier's own perception of "risk" that an uninspected farmer might use conventional commercial fertilizers or chemical sprays, in lieu of organic inputs, when no one was looking.

**(1)    Agribusinesses eventually dominate grower groups and make the farmers invisible**

28.

Self-appointed organic certification entities from the unregulated era, along with new certifier applicants, gravitated into USDA "accredited" certifier status by going through formal accreditation procedures developed by the NOP that followed enactment of the OFPA. Although the OFPA was enacted in 1990, the USDA/NOP did not begin to accredit certifiers until the 2000-2002 time frame.

29.

By that time, unregulated grower group certifications had split into two discrete categories. One category ("the farm co-op model") conceptually follows the original ideal of a farm cooperative that was purportedly created to help disadvantaged foreign farmers – that is, a self-organized group of farmers that came together to jointly market their organic produce. The other category ("the agribusiness model") involves a nonfarmer food processor, or a nonfarmer trader, who buys from a defined list of farmers, with the processor/trader becoming a group "member" that both administrates "internal inspections" of the farmers and pays all the certifier's charges.

30.

As part of the evolution of the agribusiness model, foreign certifiers commenced the systemic practice of issuing organic "crops" certificates directly to processor food factories and marketer middlemen making them, constructively, the organic "farmers." Details about the actual farmers were left off organic certificates – which made the farmers invisible to the public and completely untraceable. This mode of organic certification was well-entrenched by the time the USDA/NOP formally began to "accredit" certifiers – and it continues today with little effective

control by the USDA/NOP over the foreign certifiers who engage in these kinds of certification

practices.

31.

As time passed, the original farm co-op model became minimized; and the agribusiness

model became dominant – mostly by large agribusinesses operating in Latin America, Asia, and

Africa. This evolution was further guided, tacitly or not, by certain USDA/NOP officials in

collaboration with certain agribusiness-friendly members of the NOSB who supported grower

group certifications. The global scale is now enormous:

> The most important organic crops grown under ICS systems are
> coffee and cocoa.  However, a very wide range of products is
> produced under group certification, including many speciality [*sic*]
> crops (sugar, cotton, coconuts, bananas, pineapples, mangos, soy,
> rice, tropical nuts, quinoa, aromatic plants, vegetables or honey).
>
> If we compare the total number of producers under organic group
> certification with the total number of organic producers worldwide
> (and make some rough adjustments for missing smallholders in the
> global statistics) it can be (very approximately) be [*sic*] estimated that
> about 80% of all organic producers worldwide are certified in groups.

*See Group Certification*, pp. 41-42, Research Institute of Organic Agriculture
(FiBL) (2019) (supported by the Swiss Confederation).

**(2)    The NOSB-USDA collaboration**

  **a.    The first NOSB policy "recommendation" to the NOP concerning
    grower groups**

32.

Similar to the time it took for the USDA/NOP to begin accrediting certifiers, the first

OFPA-related final rule was not written into the CFRs until the late 2000/early 2001 time frame,

approximately 10 years after Congress passed the OFPA. *See* 65 FR 80547. This first final rule

followed the guidelines of the OFPA inspection statute and, like all the statutory sections of the

OFPA, had no provisions relating to grower group certifications.

33.

In October 2002, the NOSB issued its first grower group policy recommendation to the USDA/NOP: "Criteria for Certification of Grower Groups" (the "2002 NOSB recommendation"). Ignoring the OFPA inspection statute, the recommendation disclosed that "historically" not all grower group members' farms were individually inspected by the certifying agent annually, which therefore required an "internal control system" to be in place. The recommendation set forth complicated and open-ended conditions for ICS self-inspection of farms in the group – those conditions to be interpreted and administrated on a discretionary basis by certifiers. The recommendation spoke only to "the certification of a group of producers whose farms are uniform in most ways," thereby disguising what those involved with the NOSB/NOP process knew (or should have known by that time) – agribusinesses had taken over grower group certifications.

**b.　　AMS oversight throws a wrench into the "spot check/honor" system**

34.

USDA/NOP officials appear to have recognized the fundamental conflict between the OFPA inspection statute and the NOSB's nonbinding policy recommendation because the USDA/NOP did not adopt the 2002 NOSB recommendation.

35.

A few years following the 2002 NOSB recommendation, an accredited certifier refused to grant organic certification to a grower group in Mexico. The certifier's refusal was appealed by the Mexican grower group to an AMS Administrator within the USDA.

36.

The AMS Administrator affirmed the denial of the Mexican grower group's certification in a decision dated October 27, 2006 (the "AMS decision").

37.

The AMS decision followed the requirements of the OFPA inspection statute, 7 U.S.C.

§ 6506(a)(5), that mandates that every farm must be inspected by an accredited certifier.

38.

The AMS decision found, in part, that the use of an ICS-based (or spot check/honor)

system for certifying grower groups is not consistent with U.S. organic policies.

39.

The AMS decision found, in part, that an ICS cannot be used "as a proxy for the

mandatory on-site inspections by a certifying agent."

40.

The AMS decision was recognized as requiring inspection of "100 percent" of the farms

in a grower group by the USDA/NOP, the NOSB, and those having stakes in the grower group

certification system.

**c.     The AMS decision is called "an impending crisis" internally at NOSB**

41.

During subsequent NOSB meetings in March 27-29, 2007 (the "March 2007 NOSB

meeting"), one former NOSB member stated the following about the AMS decision:

> We're looking at an impending crisis if the entire grower group
> certification system is thrown out the window.

*See* Transcript of NOSB meeting (March 27, 2007), TR p. 77, ll. 17-19.

42.

In response, the chair of the NOSB, stated:

> However, I appreciate you bringing it up and giving me a chance to
> comment on it.  And I also share with you the concern for this
> industry, that this new, I won't say new, but this current guideline
> and interpretation that certifiers have to follow.  And I think it's a

major industry issue, and my committee, I'm the chair of the Certification and Accreditation Compliance Committee, is going to put it on our work plan. And we hope to come back to the next meeting with a recommendation.

And needless to say, we will also, in our close collaboration with the NOP, work to ameliorate this situation, to preserve organic integrity, but also to support all of the – a number of the grower groups that are following, you know, and demonstrating organic integrity, and not have the damage to the industry that this could possible *[sic]* cause result.

So, but unfortunately, you know, this meeting is booked to the, right to the end with current 606 and other issues, so we really can't take it up and make it a forum. But we are all aware of the issue, and we're going to deal with it as expeditiously as possible.

*See* Transcript of NOSB meeting (March 27, 2007), TR p. 79, ll. 13-25 & p. 80, ll. 1-8.

     **d.**     **Portraying themselves as representatives of the "small farmer," coffee industry interests and Dole Fruit ask the NOSB to continue recommending that the USDA/NOP adopt the "spot check/honor" system as formal policy**

43.

As part of the public comments during the March 2007 NOSB meeting, a representative

of the coffee industry stated the following about the AMS decision:

I'm here to comment on the possible change and possible ban of the internal control system for grower group certification which came to light very recently in meetings in Germany and in California, NOP certifiers training sessions.

I make my comments based on my understanding that the NOP will begin to require that 100 percent of all farms within a small farmer coop to be inspected annually by independent certification agencies.

\*     \*     \*

For coffee, it could essentially wipe out the organic coffee market in the United States, because the small farmers are the ones that supply the coffee.

\*     \*     \*

For many years now, community grower groups have been inspected and certified based on an internal control system evaluation.

Page 13 – COMPLAINT

*     *     *

> I did speak with one of the grower groups that we work with out of
> Nicaragua.  They, it's about a 2000 member coffee cooperative.
> They say that their costs under this new kind of rule would be
> $50,000, and those are for farmers that maybe earn an income of
> $1000 to $2000 a year.  So you can see that that would just not be
> possible for them to pay that high cost.

*See* Transcript of NOSB meeting (March 27, 2007), TR p. 109, ll. 1-25; p. 110,  ll. 1-25; p. 111, ll.
1-25; & p. 112, ll. 1-7.

44.

According to the coffee industry representative's numbers, the AMS decision would

increase a 2,000-member cooperative's costs by $50,000, or an average of $25 per member

($50,000 divided by 2,000). For members earning an income of $1,000 to $2,000 per year, each

farmer's cost increase would therefore approximate a minimal 1.25% to 2.5% of revenue,

assuming those extra certification costs were paid to the certifier by the farmers in the first place

– except, the farmers were apparently selling to a coffee cooperative that likely paid the certifier.

Farm cooperatives generally purchase the crops of farmers who are cooperative members and

then sell the crops at a profit to downstream customers – which means the farmers may or may

not incur any extra certification costs at all. Cost was not the issue – the issue was that the coffee

industry did not want farm inspections.

45.

Likewise, adding to coffee industry comments, a representative from Dole Fruit

International ("Dole Fruit") stated:

> Now, that recently the NOP has pronounced itself requesting the
> inspection of 100 percent of the plots of the small grower groups.
> This will imply a significant increase in the number of available
> certified inspected small grower groups, in the certification cost,
> and will reduce the importance of the internal control system.

> This interpretation from the NOP substantially affects the
> operations of thousands of non-grower *[sic]* groups in Africa, Asia,
> and Latin America and substantially affects the viability of the
> supply of organic group certification and the supply of the organic
> goods produced by such groups.

> Therefore, hereby, we from Dole ask the NOSB to insist that the
> NOSB *[sic]* adopts its recommendation from October 20, 2002
> regarding the criteria for certification of grower groups in order to
> avoid a situation where thousands of the small farmers in the
> tropics will be affected by regulation and may assist only for large
> farms.

*See* Transcript of NOSB meeting (March 27, 2007), TR p. 372, ll. 12-25 & p. 373, ll. 1-3.

46.

Dole Fruit also questioned why the "spot check/honor" system had not been adopted as

formal USDA/NOP policy, given that years had passed following the 2002 NOSB

recommendation, and wanted to know what Dole Fruit could do to get it done:

> And, finally, I have three questions. Number one is why hasn't the
> NOSB recommendation been adopted by the NOP yet? Number
> two is, when can we expect that this recommendation will be
> adopted, and number three, what kind of actions we, the growers in
> the tropics, can perform or we can be doing in order to support
> your job as the NOSB in order to get this done? Thank you.

*See* Transcript of NOSB meeting (March 27, 2007), TR p. 373, ll. 4-10.

47.

One NOSB member later stated:

> It's awfully quiet in here.

*See* Transcript of NOSB meeting (March 27, 2007), TR p. 374, l. 22.

48.

The NOSB's "Certification and Accreditation Compliance Committee," which consisted

of a majority of agribusiness-friendly members, then commenced a 1.5-year collaboration with

upper-level officials in the USDA/NOP with the goal of bypassing the AMS decision so that

foreign agribusinesses could avoid farm inspections.

      **e.     The USDA/NOP immediately adopts the "spot check/honor" system as formal policy**

49.

The initial part of the collaboration involved the USDA/NOP responding to Dole Fruit's

question by quickly issuing a policy statement, dated May 2, 2007, entitled "NOP and NOSB

Collaboration on Grower Group Certifications" (the "May 2007 NOP/NOSB Collaboration

Document"). This collaboration document ignored the AMS decision and, after a nearly 4.5-year

delay, formally adopted the 2002 NOSB recommendation as official NOP grower group policy.

In essence, this document was an instruction by the USDA/NOP to foreign certifiers that they

could continue the "spot check/honor" system of certification for their agribusiness clients,

business as usual, despite the overruling AMS decision.

      **f.     The NOSB then calls the AMS decision "informal" – and the USDA loses record of it**

50.

During the following May 2008 NOSB meetings, information emerged that the NOSB's

"Compliance, Accreditation & Certification Committee" (or "CACC") had drafted a new grower

group recommendation with the intent of circumventing the AMS decision and continuing

grower group certifications, as is. However, the draft also made the agribusiness model of group

certification less disguised compared to the previous 2002 recommendation.  This attracted the

attention of and drew objections from U.S.-based certifiers.

51.

In a letter dated October 30, 2007, the Accredited Certifiers Association ("ACA") which,

at the time, represented 34 USDA accredited certifying organizations operating in North

America, objected to the CACC draft recommendation, in part, as follows:

> Historically, grower group certification was developed to address small farms not located in readily accessible areas, marketing the same products. Retailers, processors and handlers are by nature in accessible locales as well as far removed from the group social tradition and do not function in ways that remote cooperatives do, and as such are not in need of the same considerations.

*See* ACA Letter to NOSB (October 30, 2007), p.2.

52.

The California Certified Organic Farmers ("CCOF"), which is a nonprofit organization

that certifies most of the organic farmland in California, objected to the CACC draft as follows:

> CCOF has not and does not certify grower groups. We believe that, in order to uphold the integrity of organic and provide the oversight that consumers demand, that each grower should complete the full certification process, including an annual onsite inspection by an accredited certifier.

> We believe that handlers, processors, retailers, and restaurants should not be allowed under group certification.

> We do acknowledge that grower groups have been allowed, in order to enable small growers to achieve certification, which increases the amount of farmland under organic production. However, we believe that grower groups should be phased out of the NOP.

> \*      \*      \*

> We do not believe that the proposed grower group model increases the ability to detect non-compliance. In fact, it might be easier to hide non-compliance issues if the operator wants to.

> \*      \*      \*

> Some consumers are already questioning the integrity of organic and the organic seal. We believe that the issue of grower groups will continue to confuse or add to the confusion of consumers and will add to the loss of confidence and trust in the organic seal, which would impact the entire organic marketplace.

*See* Transcript of NOSB meeting (May 20, 2008), TR p. 338, ll. 13-22; p. 339, ll. 1-22; p. 339, ll. 1-22.

53.

Ignoring the concerns of U.S. certifiers, agribusiness-friendly members of the CACC

voted to submit the CACC draft as a formal NOSB recommendation, on a motion brought by one

of the committee members, Julie Weisman, who was a founder of Flavorganics.  Flavorganics

makes organic coffee, coconut, and hazelnut "extracts," among other products, and stood to

benefit if grower group certifications were left alone. On November 19, 2008, Weisman and

other NOSB members then voted to adopt the CACC draft as a formal NOSB recommendation

made to the USDA/NOP – with the formal recommendation being entitled "Certifying

Operations with Multiple Production Units, Sites, and Facilities under the National Organic

Program" (the "2008 NOSB recommendation").

54.

With respect to the earlier AMS decision, the 2008 NOSB Recommendation bypassed the

decision by, among other things, calling it "informal":

> The key development that underpins this recommendation is an
> informal decision dated October 27, 2006 in which the AMS
> Administrator determined that a certifying agent's policy of
> inspecting "only a percentage of producers" in a group instead of
> annual inspections of each producer in the group was inconsistent
> with 7 CFR § 205.403.

55.

The 2008 NOSB Recommendation omitted any references to the OFPA inspection

statute, and it did not address the most fundamental problem, *i.e.,* the spot check/honor system is

inconsistent with the OFPA inspection statute – even though this omission was pointed out to the

NOSB during earlier May 2008 NOSB meetings:

> The draft from the Committee, the discussion document makes no
> mention of OFPA 2107(a) *[sic]*, which states, "A program
> established under this title shall provide for annual onsite

inspection by a certifying agent of each farm and handling
operation that is certified under this title."

*See* Transcript of NOSB meeting (May 20, 2008), TR p. 338, ll. 14-20.

56.

In addition to the NOSB calling the AMS decision "informal," the USDA/NOP now

indicates that no record of it exists.

57.

On June 28, 2023, the USDA/NOP received the following FOIA request:

This email is a FOIA request for a copy of an AMS Administrator's
Appeal Decision denying organic certification of a Mexican
grower group (APL-011-06).

I do not have the party or administrator's name.  However, the
decision was apparently issued on October 27, 2006.

I am only asking for a copy of the decision and no other
documents.

58.

The USDA/NOP responded to the above FOIA request on July 20, 2023, as follows:

AMS' search began on July 7, 2023.  Please be advised that our
search located no records responsive to your request.

**g.**     **The USDA/NOP adopts the 2008 NOSB recommendation as policy that
continues the "spot check/honor" system**

59.

The 2008 NOSB recommendation was adopted as USDA/NOP policy by way of a

January 21, 2011, policy memorandum to "Stakeholders and Interested Parties" (the "McEvoy

memo"). The McEvoy memo suggested that the NOP would be drafting guidance regarding

certification of grower groups, and suggested there would be future changes to the CFRs, along

with requesting public comment.

60.

Concerning instructions to accredited certifiers, the McEvoy memo stated:

> In the interim, accredited certifying agents should use the National
> Organic Standards Board (NOSB) recommendations of October 2002
> and November 2008 as the current policies.

61.

The McEvoy memo's suggestion of future changes to the CFRs did not occur for another

12 years – and eventually became the 2% Rule – made effective on March 20, 2023.

**C.    "Spot checks" under the 2% Rule are based on arbitrary "risk factors" and other
impractical recommendations made by NOSB members; "1.4 times the square root
or 2%" is an arbitrary standard for certifier spot check inspections**

62.

Accredited certifiers are agents who are empowered by the USDA/NOP to act on behalf

of the NOP as part of implementing organic compliance under the OFPA. Many state agencies in

the U.S. are accredited as certifiers under the OFPA. The OFPA also allows private parties to run

certification operations.  7 U.S.C. § 6502(3).

63.

By instructing certifiers to use NOSB recommendations from 2002 and 2008 as "current"

USDA/NOP grower group policies, the McEvoy memo continued to empower accredited foreign

certifiers with open-ended discretion to spot check combinations of farms and other entities as a

single grower group. At present, those certifiers operate under the same instruction, subject only

to the new, modified lower limit spot check requirement of the 2% Rule (*i.e.,* "1.4 times the

square root or 2%"). Other than this change, USDA/NOP grower group policy guidelines largely

remain the same both before and after the "SOE" – and it remains a system that is open to self-

interpretation by foreign certifiers.

1.    **The 20 "risk factors" developed by the NOSB**

64.

Regarding the above, the 2008 NOSB recommendation created the concept of certifier-interpreted "Sampling and Risk Analysis."  This concept included NOSB recommendations for "sampling rates" for grower group inspections based on the certifier's discretionary assessment of twenty (20) specific "risk" factors.

65.

Depending on the integrity of the certifier, the NOSB "Sampling and Risk Analysis" made it possible for the certifier to decide that the "sampling rate" for actual farm inspections could be any number between 0% and 100%, because the certifier had the discretion to include the locations of nonfarmer group members as part of the sampling. Whether the "site" for inspection be farm or factory, the 2008 recommendation also weakened the probability of on-farm inspections by creating its own, new definition of "site" for inspection. The NOSB recommended that "site" means the "location of *management activities* for a given production unit." This granted corrupt certifiers the discretion to say they had inspected farm sites if they merely visit a processor's office who was purportedly managing the activities of the farmers in the group, thereby avoiding any requirement to send certifier personnel to farms. As just discussed, this has now changed slightly under the 2% Rule, because the minimum sampling rate has been raised from 0% to "1.4 times the square root or 2%" of the sampled population. But overall, the "Sampling and Risk Analysis" undertaken by the certifier otherwise remains subject to the same 20 risk factors along with the option to inspect "office" sites in lieu of "farm" sites.

66.

The risk factors were arbitrarily invented by NOSB members.  For example, the last one

of the 20 risk factors involves farms "Grossing $5,000 or more in US organic sales per year."

One NOSB member described it as "the $5,000 threshold":

> I think our recommendation would not be weakened by including
> the 5,000 threshold as simply a risk factor, and leaving discretion
> in the hands of certifiers.

*See* Transcript of NOSB meeting (Nov. 19, 2008), TR p. 99, ll. 8-10.

67.

According to the above risk factor, if a single farm in a grower group grosses less than

$5,000 in revenue, then it could be "low risk" for being out of organic compliance, or cheating. If

the same farm grosses above $5,000 the next year, then it could be "high risk," if the certifier

optionally chooses to see it that way, depending on the certifier's discretionary evaluation of the

other 19 risk factors. Then, if the same farm grosses less than $5,000 in the following year, it

again becomes "low risk."

68.

The USDA/NOP cannot provide any reasonable basis for determining that a farm moves

from "low" to "high" risk for organic compliance based on a $5,000 threshold in farm revenue.

69.

The USDA/NOP likewise cannot provide any reasonable basis for determining a farmer's

"risk" of organic compliance or noncompliance, as the case may be, for any of the other 19 risk

factors.

(2)     **The USDA/NOP "slide show" for training certifiers to do grower group certifications**

70.

Based on the 2008 NOSB recommendation, the USDA/NOP developed a slide show presentation for training certifiers on how to certify grower groups. The slide show, dated February 10, 2015, was designed to help those certifiers engaged in group certifications to "[U]nderstand the current NOP Grower Group certification policy."

71.

The 2015 slide show sets forth illusory group requirements that an ordinary person would find very difficult to deal with or manage; therefore, it is unlikely any group actually follows the requirements. However, actual compliance does not matter, provided that the 2008 NOSB recommendation appears somewhere in the group's "written" plan for self-inspection (aka their "internal control system").

72.

Among other requirements, the slide show trains certifiers to review a group's written plan to confirm it includes the following "minimum" group record keeping requirements:

**Minimum recordkeeping requirements** 
- ✓ The Organic System Plan
- ✓ Contractual arrangements with individual members
- ✓ Description and location of the parcels and the facilities
- ✓ Production plans
- ✓ Records of inputs used, such as seeds and soil amendments
- ✓ Records of pest management materials and practices
- ✓ Internal inspection reports
- ✓ Records of products harvested
- ✓ Records of production, processing, sales, and inventory

*See* USDA AMS/NOP Presentation (Feb. 10, 2015), p. 8.

73.

Concerning the above record keeping requirements, in the slide show, the USDA/NOP states that the highest concentration of grower groups are located in Latin America and Asia, but the largest grower groups are located in Africa. The USDA/NOP states that the "Smallest groups have a few members; the largest groups have thousands."

74.

Regardless of what a group's "written plan" states, the USDA/NOP cannot produce reliable evidence that establishes that grower groups in Latin America, Asia, or Africa are actually complying with the above "minimum record keeping requirements."

75.

The slide show also sets forth unrealistic qualification guidelines for "ICS Personnel":

### ICS Personnel 
- ✓ Fluent in language used by group.
- ✓ Able to read and write in language.
- ✓ Well-versed in USDA organic regulations.
- ✓ Familiar with local production methods.
- ✓ Familiar with organic practices.
- ✓ Competent in ICS procedures.

*See* USDA AMS/NOP Presentation (Feb. 10, 2015), p. 13.

76.

The USDA/NOP cannot produce reliable evidence that establishes that certifiers are engaging in actual, detailed examinations of the individuals who are the so-called "ICS personnel" to ensure that the above checklist factors are met. In particular, the USDA/NOP cannot produce reliable evidence that establishes the "ICS personnel" for the grower groups in Latin America, Asia, and Africa are "Well-versed in USDA organic regulations" as per the above,

critical checklist requirement. It is also unlikely the USDA/NOP can produce copies of USDA organic regulations that have been translated into all the required local languages; or that translated copies of the 2% Rule exist for all the local languages; or that translated copies of the lists of substances that are allowed or prohibited for organic use (which are regularly reviewed and sometimes updated) exist for all the local languages so that all local ICS personnel can be "well-versed."

77.

The slide show also sets forth certifier training "exercises" for developing spot check "sampling rates" based on "risk assessment." The intent of these exercises was to replace farm inspections according to the NOSB's 2008 recommendation: "it is possible that proper multi-site inspection may be achievable through risk assessment and sampling rather than through direct observation of every member of the producer group every year." However, these exercises are incomprehensible and, therefore, unlikely to be followed by any certifier. The USDA/NOP has no reliable evidence that this situation has been changed, improved, or "strengthened" by the 2% Rule.

78.

In Federal Register comments, the USDA admits that the above system is a broken one – although the USDA is unwilling to admit that it cannot be fixed:

> Through certification audits and field visits, USDA has witnessed many of the common problems created by the lack of a codified producer group standard.
>
> The most common, and difficult to address, challenge is lack of a well-functioning ICS.
>
> *       *       *
>
> As a result, NOP audits have uncovered issues such as application of prohibited synthetic fertilizers and pesticides, mixing of conventional and organic products, decentralized storage that causes mixing and contamination, and poor or nonexistent

recordkeeping that makes traceability and verification of integrity difficult. <u>These issues sometimes persist because the current regulations lack ICS responsibilities and NOP therefore has no mechanism or basis for citing noncompliance</u>.

*     *     *

Often, ICS personnel are relatives or friends of the members and may withhold or obscure evidence of noncompliance or fraud. In other cases, <u>the influence of a buyer or exporter will lead members to compromise organic integrity</u> in order to meet specific quality or volume targets.

In addition to the ICS, the lack of general criteria that producer groups must meet creates challenges for certifying agents. This is most often seen as an absence of critical information about the producer group and its members. <u>Producer groups often do not provide certifying agents with basic information, such as accurate maps, location of plots, acreage, and production practices and inputs. During inspection, certifying agents commonly cannot locate members, plots, boundaries, or central distribution points, making it difficult to complete basic audit techniques such as yield analysis or mass balance.</u>

The unique conditions of producer group production mentioned above, when combined with poor oversight and enforcement mechanisms at the ICS level, create an environment where loss of organic integrity and organic fraud are more likely to occur.

*See* Federal Register (Vol. 88, No. 12), p. 3593 (underlining added).

79.

In essence, the above USDA comments are a summary of what consumers have been getting for decades when they buy "organic" bananas bearing the USDA seal in supermarket chains: "prohibited synthetic fertilizers and pesticides, mixing of conventional and organic products" and "decentralized storage that causes mixing and contamination."

80.

Because the NOSB/USDA/NOP and agribusinesses did not like it, the USDA "forgot" that the AMS decision demonstrates that mechanisms have long existed for dealing with organic

noncompliance issues. Instead, the USDA suggests in the above Federal Register comments that it has been witnessing a broken system for a long time as a bystander with hands tied. But now that the words "internal control system" have finally found their way into written regulations, the problem is "fixed" – that is, the USDA has been unbound and called to action; the certifiers will get the information they need and can accurately identify where the farms are located, for the first time; and agribusinesses will no longer use their influence to compromise organic integrity. In reality, the only significant change the 2% Rule makes from before is "1.4 times the square root or 2%."

    **(3)**    **The USDA has no evidence that a minimum sampling rate of "1.4 times the square root or 2%" is reliable**

81.

First, writing into the final rule "1.4 times the square root or 2%" for inspection of "producer group members" is an arbitrary standard that is based on random choice rather than something that is evidence-based to show reliability.

82.

Second, the new rule's definitions section now defines "producer group member," for the first time, in a way that is designed to enable corrupted certifiers to game the system, if they want to:

> *Producer group member*. An <u>individual</u> engaged in the activity of producing or harvesting agricultural products as a member of a producer group operation.

37 CFR § 205.2 (underlining added).

83.

Introduction of the word "individual" in a rule definitions section that is coupled to an undefined "producer group operation" that is left for a certifier to define, at the certifier's discretion, leaves things open-ended. It enables the certifier to "count" individuals who work in

food factory, trucking, and warehouse settings, in addition to farms, if the certifier chooses to call

them all one "producer group operation." This gives corrupt certifiers the discretion to

disproportionately spot check "individuals" who are nonfarmers as part of meeting the "1.4 times

the square root or 2%" spot check requirement. Given that the USDA/NOP has never altered the

NOSB's recommended definition of "site," discussed above, a corrupt certifier could count

individuals in a processor's offices as farm managers and inspect that site (*i.e.,* the office) as the

farm, depending on how the certifier sees the "risk factors." For example, in the case of Turkey

(*see ¶¶* 91-115), it is easier to access individuals in an agribusiness processing facility compared

to individuals on farms more than 100 road miles distant, in another province. *See, e.g.,* Ex. A,

(Bates Nos. PF0000013-15).

84.

Using terms such as "Internal Control System" in lieu of more accurate descriptions, and

contrary to recent Federal Register comments, both the USDA/NOP and NOSB have long touted

the spot check/honor system to be "reliable" and "strong."

85.

The USDA/NOP and NOSB have, for a long time, intentionally sought to bypass the OFPA

inspection statute by promoting the "Internal Control System" as "one governing compliance

scheme that may reduce the need for direct observation by inspection of each unit or site."

**DAMAGE/STANDING**

86.

Congress did not accept grower group certification practices when it enacted the OFPA –

which is why the OFPA inspection statute requires inspection of <u>every</u> farm – not "spot checks"

of some farms.  As discussed above, the AMS agreed.

87.

Grower group certifications have lurked under the radar of general public awareness for decades – probably because these certification practices largely apply to tropical crops that have never significantly competed with U.S. organic farmers. Hazelnuts are a unique exception because foreign hazelnuts are grown in temperate climates at latitudes similar to those in North America.

88.

Because grower group certifications are a uniquely foreign practice, if asked, U.S. organic farmers and handlers are generally unaware of them and how they work. On the other hand, certain members of the NOSB, the NOP, foreign certifiers, some U.S. food manufacturers who want low-cost foreign agricultural products that bear the USDA seal, and the tropical-crop agribusinesses have long been aware of them.

89.

Moreover, both NOSB members and the NOP have long known about the legal problems that attach to grower group certifications, with NOSB meeting transcripts showing NOSB members using terms like "train wreck" and "an attorney would drive a semi right through this thing" multiple times during back-and-forth grower group discussions that were on-record:

> No, what I'm talking about is the public relations semi truck train wreck that could occur on this thing when it comes out in the New York Times that product selling in the United States from someone in China making over $10,000 a year is not being inspected, when a grower in Vermont making 5,000 and 1 is having to.

*See* Transcript of NOSB meeting (Nov. 19, 2008), TR p. 69, ll. 11-18.

*    *    *

> Again, the fear that seems to be driving – and you have expressed it clearly, it's fear – we are afraid of a scandal, we are afraid of a train wreck, and all that sort of thing. And if you try to over-

regulate, I guarantee you people, you will cause the train wreck by
overprescriptive *[sic]* – and I think we are seeing that happen.

*See* Transcript of NOSB meeting (Nov. 19, 2008), TR p. 70, l. 1; & p. 71, ll. 1-7 (*see also* TR p.
64, ll. 19-22; p. 65, ll. 4-7; p. 65, ll. 9-21; p. 77, ll. 3-14; p. 92, ll. 11-20; p.111, ll. 21-22; & p. 112,
ll. 1-3).

90.

Grower group certifications have also divided the certifiers who work within the organic

certification system into two categories: (1) the good ones who refuse to certify grower groups

because they recognize the problems and (2) the corrupted ones who are willing to do it.

**A.**    **This Complaint arose because "organic" Turkish hazelnut imports, made via
"grower group" certifications, are being sold at negligible organic premiums in the
U.S.**

91.

In 2022, an employee of a local Oregon processor orally informed Pratum Farm that

Turkish hazelnut processors were selling "organic" hazelnut kernels in the U.S. at negligible

organic premiums over Turkish "conventional" hazelnut kernels.

92.

At that specific time, organic hazelnut farmers in Oregon were receiving a significant

organic premium over conventional prices, because Turkish conventional imports were driving

down conventional Oregon prices to historical lows.

93.

Organic premiums paid to farmers are based on lower organic yields, certification costs (*i.e.,*

certifiers charge farmers, and others, time-based fees for organic inspections), and the willingness

of U.S. consumers to pay higher prices for healthy and environmentally sound farm products.

94.

The business math of organic premiums means that any processor/buyer who purchases

an organic farmer's crop must recapture the cost of the farmer's organic premium and other

related costs incurred by the processor (*e.g.,* the processor's own certification costs). This directly results in the processor also having to charge an organic premium to the processor's customers.  *See* ¶¶ 147-150, *infra.*

95.

Therefore, negligible organic premiums for Turkish hazelnut kernel imports sold into the U.S. market indicate two things: (1) organic certification costs are being bypassed in the farm-to-table chain in Turkey; and (2) Turkish farmers are being paid little or no organic premiums.

**(1)    The USDA had no record of certified organic hazelnut farms in Turkey**

96.

After receiving word of negligible Turkish organic premiums, Pratum Farm first reviewed publicly available import records and discovered that Turkish processors are causing the import of substantially greater quantities of "USDA-certified" organic hazelnut kernels into the U.S. compared to the local domestic production of organic hazelnuts by U.S. farmers. From these records, Pratum Farm identified five (5) Turkish processors who, along with related entities or U.S. importers, were causing these imports.

97.

Available information also indicated that all five (5) of the Turkish processors were industrial agribusiness or food factory complexes – one owned by a multi-billion-dollar international agribusiness conglomerate.

98.

The USDA requires accredited certifiers to input information about the organic operations they certify in a public database called "Integrity."  The USDA describes the "Integrity" database as follows:

> The Organic INTEGRITY Database is a certified organic
> operations database that contains up-to-date and accurate
> information about operations that may and may not sell as organic,

deterring fraud, increases supply chain transparency for buyers and sellers, and promotes market visibility for organic operations.

https://data.nal.usda.gov/dataset/organic-integrity-database.

99.

The USDA instructs the public that "You can find a certified organic farm or business…" by using the "Integrity" database.  *See* https://data.nal.usda.gov/dataset/organic-integrity-database.

100.

While all Oregon organic hazelnut farmers known to Pratum Farm were identifiable in "Integrity," there were no identifiable records in "Integrity" of a single certified organic operation in Turkey that is just a hazelnut farm.

101.

With respect to the above 5 processors, at the time, "Integrity" identified some as certified organic "handlers," only, and some as "handlers" that appeared to also hold a "scope" of certification for "crops."  However, the latter were processors, only, and not farmers. None were identified as "grower groups" in Integrity's grower group search category at that specific time.  It was later learned that the USDA does not require certifiers to identify "grower group" certifications in "Integrity" – therefore, most foreign certifiers do not do it.

**(2)    The USITC investigation**

102.

Because "Integrity" showed no identifiable evidence of certified organic hazelnut farms in Turkey, but import records showed a substantial quantity of organic hazelnut kernel imports coming into the U.S. from Turkey, Pratum Farm filed a complaint with the U.S. International Trade Commission ("USITC") requesting that the five (5) processors be investigated for false

advertising of the USDA organic seal. The USITC granted Pratum Farm's investigation request ("the USITC investigation"). *See "In the Matter of Certain Hazelnuts and Products Containing the Same,"* USITC Investigation No. 337-USITC-1337.

103.

The USITC investigation subsequently revealed that all the processors were using the USDA organic seal by directly or indirectly taking advantage of the grower group certification system, with organic certificates being issued by five (5) different foreign certifiers under different variations of the agribusiness model described above.

104.

The USITC investigation also resulted in the production of evidence from the processors that showed substantial fraud and noncompliant practices by both certifiers and processors in connection with issuing organic certifications. The investigation also revealed that USDA/NOP administration of the OFPA was the root cause of these problems.

105.

The USITC has limited jurisdiction and no power or authority to administrate organic certifications on behalf of the USDA, usurp the USDA's authority to administrate the organic certification program, or cancel organic certificates issued under circumstances that involve fraud. Therefore, when the USITC investigation revealed that the Turkish import problems were attributable to USDA/NOP administrative practices, Pratum Farm dismissed the USITC action without prejudice.

106.

The USITC investigation nevertheless resulted in the production of information and documents that revealed (1) Turkish processors and traders do not comply with self-inspection or "internal inspector" requirements under the grower group spot check/honor system (*see, e.g.,* Ex. A

(Bates Nos. PF000006-12 & PF0000019)); (2) fraudulent buy/sell documentation relating to organic hazelnuts (*see, e.g.,* Ex. A (Bates Nos. PF000008 & PF0000052)); (3) fraudulent farmer lists (*see, e.g.,* Ex A (Bates Nos. PF0000016-18 & PF0000083-91)); (4) "production units" that produced "crops" from Turkish urban neighborhood and residential apartment buildings – far from any farms (*see, e.g.,* Ex A. (Bates Nos. PF0000020 & PF0000022)); (5) "crops" certificates issued to a large scale urban food factory complex (Nimeks) that included laundry lists of wide varieties of unrelated "certified" crops and processed foods that no reasonable person would believe are coming from "a group of producers whose farms are uniform in most ways" – with the certificates having been issued by a certifier who USDA auditors found to "not consistently demonstrate during the audit an adequate understanding of the USDA regulations and NOP policies" – and after Nimeks had been cited on certain organic noncompliance issues that resulted in an August 2019 settlement agreement with the USDA/NOP (*see, e.g.,* Ex. A (Bates Nos. PF0000022-26 & PF00000164-167)); (6) ineffective USDA control over foreign certifiers who are engaged in grower group certification practices (*see, e.g.,* Ex A. (Bates Nos. PF0000020-21 & PF0000022-23)); and (7) most importantly, no traceability to purported Turkish "organic" hazelnut farms (*see, e.g.,* Ex. A. (Bates Nos. PF000006-26)).

107.

The USITC investigation produced evidence confirming what Pratum Farm had been told: Turkish "organic" hazelnut kernels are being imported into the U.S. at negligible organic premiums over Turkish "conventional" imports. One Turkish processor/ exporter of organic hazelnut kernels (Arslanturk) was selling organic kernels out of Turkey at an approximate 3% premium over conventional prices for crop year 2022. *ee* Ex. A (Bates Nos. PF000005 &

PF0000040).  Arslanturk is a large Turkish agribusiness/factory complex that collaborated with a foreign certifier, Ecocert SAS ("Ecocert"), to obtain organic certificates as a "grower group."

### (3) The USDA/NOP also refused to investigate grower group fraud called to the attention of the USDA/NOP by the USITC

108.

Based on information received during the USITC investigation, Pratum Farm earlier delivered to the USDA a private party complaint, dated July 20, 2023, directed against the five (5) foreign certifiers who were responsible for the above certifications (the "July complaint"). The July complaint requested the USDA to revoke the accreditation of all five (5) of the certifiers.  The July complaint also put the USDA on notice that grower group certifications that use the spot check/honor system are illegal under the OFPA.

109.

Additionally, the July complaint alleges that upper-level USDA/NOP personnel impeded investigation of *prima facie* fraudulent farmer list documents that Arslanturk alleged had been properly issued by Ecocert.  *See* Ex. A (Bates Nos. 0000018-19).

110.

Ecocert has an international track record of noncompliant practices in connection with organic certification that includes, among other things, an October 2018 settlement agreement with the USDA/NOP that involved alleged violations of organic regulations by Ecocert's staff in Izmir, Turkey.

111.

Based on Arslanturk's allegations, the USITC investigation revealed that, following Ecocert's settlement agreement with the USDA/NOP, Ecocert's Izmir staff caused the creation of fraudulent grower group farmer lists on organic "annex" certificates consisting of approximately

1,400 unusable, 10-digit farmer ID "codes." These codes appear on the face of the certificates as out-of-sequence, randomly generated numbers. Based on Arslanturk's allegations about the source of the certificates, documents produced by Arslanturk, and other related evidence, Ecocert's Izmir staff generated these documents as superficial "farmer lists" for the purpose of giving Arslanturk an organic certificate for "crops" that Arslanturk could show to its customers as justification for using the USDA organic seal.  *See* Ex. A. (Bates Nos. PF0000016-18). Ecocert's primary certification business in Turkey involves issuing grower group certificates to Turkish businesses.

112.

The July complaint describes that USITC staff agreed that the 10-digit farmer ID codes appeared to be fraudulent and referred the issue to the USDA for further investigation, only to be informed that upper-level USDA/NOP personnel impeded thorough investigation of the Arslanturk farmer lists.

113.

Given Ecocert's earlier track record of noncompliant practices in Turkey and given that the USITC investigation revealed new Ecocert certification activities that may or may not have raised issues of breach of the earlier USDA/Ecocert settlement agreement, upper-level USDA/NOP personnel were obliged to pursue rather than impede a thorough investigation of Ecocert.

114.

Because the above involved a potential act of agency wrongdoing (*i.e.,* USDA/ NOP refusal to investigate possible fraud by an agent (Ecocert) of the USDA/NOP), the July complaint was also submitted to the USDA's Office of Inspector General ("OIG") for review.

115.

The July complaint is attached as Exhibit A and is incorporated as part of this complaint.

Receipt of the July complaint was acknowledged by the USDA/NOP, but not the OIG.

**B.    The 2% Rule destroys the integrity and "goodwill" of the USDA organic seal - which harms the Plaintiff as an authorized user of the seal**

116.

In a USDA publication entitled, "Is certified organic right for your farm?" the USDA states:

> Food labeling can be confusing and misleading, which is why certified organic is an important choice for consumers.
>
> Consumers are willing to pay a premium for food that carries the USDA organic seal, or that contains organic ingredients.

117.

The USDA organic seal (the "seal") is an official certification mark ("mark") that is owned by the USDA and controlled by the NOP. The USDA has registered the seal as a certification mark with the U.S. Trademark Office (U.S. Reg. No. 6,452,285).

118.

Farmers who produce certified organic products that comply with organic regulations are authorized (or "licensed") to use the seal pursuant to regulation.  37 CFR 205.303(a)(4). Likewise, the USDA publicly states, "Certified farms and businesses are authorized to use the seal to identify their products as organic."

119.

Pratum Farm is certified to the USDA organic regulations and holds an organic crops certificate for hazelnuts issued by the Oregon Department of Agriculture ("ODA").  Pratum

Farm's NOP Operation ID No. is 7270001707 and related ODA Certification No. is AG-C0001707C.

120.

Therefore, Pratum Farm is authorized and licensed to use the USDA organic seal.

121.

Pratum Farm presently uses the seal, as a licensee, in connection with sales of organic hazelnuts to a local Oregon processor and direct sales of hazelnut kernels to the public in a local farmer's market under the assumed business name "Frankie's Oregon Organic Hazelnuts" (Oregon Bus. Reg. No. 2055622-91, registered by Pratum Farm, LLC):



122.

A mark is fundamentally a symbol of "goodwill" that creates an expectation of, among other things, consistent quality of goods or services provided in connection with the mark.

123.

A mark's "goodwill" represents the quality or characteristics of goods or services that keep customers coming back.

124.

As indicated above, the USDA publicly states that "certified organic is an important choice for consumers" and consumers "are willing to pay a premium for food that carries the USDA organic seal, or that contains organic ingredients." Therefore, as a certification mark licensee, Pratum Farm benefits from the reputation of the seal and the fact that consumers will choose to pay a premium for Pratum Farm's hazelnut products that are sold in connection with Pratum Farm's use of the seal.

125.

For the USDA organic seal to function properly as a certification mark, the quality or characteristics of goods or services provided under the mark must be consistent. In other words, the quality of "certified organic" or the characteristics of "certified organic" must be consistent.

126.

Dr. Jennifer Tucker, the current deputy administrator of the NOP, has made claims similar to the above in public recordings:

> The USDA organic seal is the gold standard around the world and the reason is because all farms and businesses around the world, *they're all part of a shared global control system* that makes sure that the system is working around the world to protect the standards, protect the farmers, and protect the seal. (emphasis added)

*See* https://www.youtube.com/watch?v=QL-_4tSb6GY @1:00.

127.

However, the 2% Rule is not part of a shared global control system – the rule is a separate and different system that has long been applied in other countries. This means that the quality or characteristics of "certified organic" are not globally consistent – but are different for agricultural products that originate from U.S. farmers versus agricultural products that originate from overseas. That difference degrades and damages the integrity of the USDA seal and those who

rely on it to "keep customers coming back" as licensees authorized to use the seal. The USDA has

largely hidden these differences from the U.S. public.

    **(1)**    **The 2% Rule also contradicts USDA claims that inspections by accredited certifiers are "vital" to organic integrity**

128.

In instructions to all accredited certifiers concerning their hiring of certifier employees as

organic inspectors, the USDA claims that farm inspections by accredited inspectors are "vital" to

the integrity of the organic system:

> Organic inspectors play a vital role in ensuring organic integrity. Their visits to organic farms and processing facilities are often the most direct contact that certifiers have with organic operations. It is important for certifiers to appropriately assess the inspector's level of expertise and ability, both during the hiring process and as part of regular performance evaluations.

*See* NOP Instruction "The Organic Certification Process," September 13, 2018, page 5 (NOP 2601 The Organic Certification Process Rev03 09 13 18).

129.

The USDA also publishes a series called "Organic 101" that explores different aspects of

USDA organic regulation.  In the eighth installment of the "Organic 101" series, the USDA

explains farm inspections by accredited certifiers as follows:

> Every operation that applies for organic certification is first inspected on site by a certifying agent. These *comprehensive top-to-bottom inspections* differ in scope depending on the farm or facility. For example, for crops they include inspection of fields, soil conditions, crop health, approaches to management of weeds and other crop pests, water systems, storage areas and equipment. For livestock, they include inspection of feed production and purchase records, feed rations, animal living conditions, preventative health management practices (e.g., vaccinations), health records, and the number and condition of animals present on the farm. At a handling or processing facility, an inspector evaluates the receiving, processing, and storage areas used for organic ingredients and finished products. (emphasis added)

130.

Moreover, on its website, the USDA explains that *accredited* certifiers are the ones who maintain the integrity of the organic system:

> Certifying agents are accredited by the USDA and are responsible for making sure USDA organic products meet all organic standards.

131.

Although the USDA calls farm inspections by an *accredited* third-party certifier a "vital" requirement for maintaining organic integrity, the USDA makes certifier farm inspections a less-than "vital" requirement under the 2% Rule.

132.

At the same time, the USDA portrays to the U.S. public that "every operation" undergoes inspections by accredited certifiers, on a worldwide basis, thereby suggesting that *all* organic farms across the world are visited by certifiers. However, to the contrary, a large percentage of foreign farms do <u>not</u> undergo a "comprehensive top-to-bottom" inspection by an accredited certifier. Instead, a certifier goes to an office and looks at a written plan for "internal inspection" that might indicate that someone (such as an office or factory worker) should visit the undisclosed site of an actual farm.

**(2)      The 2% Rule breaks the USDA's "organic promise" of farm traceability**

133.

Reasonable traceability to the farms from which organic crops are sourced is key to maintaining the overall integrity of the organic system.

134.

In the third installment of the USDA's "Organic 101" series, the USDA states:

> Organic certification requires that farmers and handlers document their processes and get inspected every year.  Organic on-site

> inspections account for every component of the operation,
> including, but not limited to, seed sources, soil conditions, crop
> health, weed and pest management, water systems, inputs,
> contamination and commingling risks and prevention, and record-
> keeping. *Tracing organic products from start to finish is part of
> the USDA organic promise.* (emphasis added)

135.

"[I]mproving farm to market traceability" is also one of the stated goals of the USDA as part

of recent SOE (strengthening organic enforcement") rulemaking. The 2% Rule does the opposite.

136.

During the Fall of 2022, Pratum Farm delivered its first certified organic hazelnut crop

(in-shell hazelnuts) to a commercial dehydrator in Eugene, Oregon, for the purpose of having the

crop washed and dried (*i.e.,* dehydrated for preservation) – which is common practice in the

hazelnut industry. The commercial dehydrator is also a certified organic handler that is required

to keep organic hazelnuts separate from conventionally grown hazelnuts during the course of

handling these products. In order to recapture its certification costs, the commercial dehydrator

charged Pratum Farm $.15 cents a pound for the service of washing/drying Pratum Farm's

organic crop. Pratum Farm has been customarily charged close to $.05 cents a pound, on

average, by dehydrators who handled Pratum Farm's conventional hazelnut crops in the past.

137.

After retrieving the crop from the commercial dehydrator, Pratum Farm later sold nearly

all of it to a local processor in Albany, Oregon, except for a small portion reserved for local

farmers market sales. The Albany processor is a shelling operation that purchases in-shell

organic hazelnuts from farmers and then sells shelled nutmeats ("kernels") to downstream

customers. The processor likewise goes through its own certification/inspection procedures, at a

certain cost to the processor, to ensure its shelling operation does not intermingle organic with the conventional hazelnuts it also shells.

138.

The commercial dehydrator required Pratum Farm's organic "crops" certificate documentation before it would wash/dry the crop as "organic." Likewise, the Albany processor required Pratum Farm's organic certificate documentation before the processor would purchase from Pratum Farm as "organic" – including documentation that demonstrated to the processor that Pratum Farm had used the certified commercial dehydrator in Eugene. Consequently, when the processor introduces kernels into the marketplace, the processor has, in addition to its own certification documentation as a handler, a reasonable string of documentation, for the processor's customers, that can be used to demonstrate that the processor can make a reasonable trace of farm origin back to Pratum Farm and other local Oregon organic farmers who sell to the processor.

139.

Pratum Farm's name and address appears on the USDA "Integrity" database, which makes it possible for any member of the public to drive down a gravel road and see that Pratum Farm's orchard floor is not sprayed out to bare dirt with herbicides like the neighbor's orchard on the other side of the road. Unknown to Pratum Farm at the time, and because it was Pratum Farm's first organic crop, Albany processor personnel did a drive-by of Pratum Farm's orchards to look for signs of herbicide and synthetic fertilizer use. Likewise, unknown to Pratum Farm at the time, the Eugene dehydrator later made inquiries of the Albany processor concerning whether the processor had checked on Pratum Farm.

140.

When the ODA inspector recently visited Pratum Farm to inspect it for organic compliance for the upcoming 2023 crop, among other things, he walked through the orchards; viewed equipment and materials in barns; saw storage totes that are proprietary for organic production; reviewed written records of Pratum Farm's organic yields; and reviewed documents between Pratum Farm and the foregoing entities specifically for the purpose of tracing Pratum Farm's crop from harvest field to the processor.

141.

All of the foregoing is in accordance with the USDA's "organic promise" of farm traceability. Among other things, the reason U.S. farms meet the USDA's "organic promise" is because the very first organic certificate issued in the farm-to-table chain is issued to the farmer.

142.

In stark contrast to the above, when Pratum Farm attempted to trace purportedly "organic" hazelnuts to Turkish farmers during the course of the USITC Investigation discussed above, the attempt to trace dead-ended at car shops, factory complexes, and urban apartment/street buildings. *See* Ex. A (Bates Nos. PF000006-26). One of the reasons for this is that, because the USDA allows the very first organic certificate to be issued to a food processor or trader, "grower group" certifications skip the farms entirely.

143.

In its July complaint to the USDA/NOP, Pratum Farm told the USDA/NOP:

> With the help of staff from the U.S. International Trade
> Commission ("USITC"), we tried to trace organic hazelnuts to
> farms in Turkey. We learned two things: (1) the organic
> certification of hazelnut farms in Turkey is unreliable because of
> "grower group" certification practices; and (2) no one can trace to
> Turkish farms.

\*     \*     \*

> Among other things, the investigation revealed that foreign grower
> group certifications set up barriers that make farm traceability
> opaque.

*See* Ex. A (Bates Nos. PF000001-2).

144.

The 2% Rule breaks the USDA's "organic promise" of "Tracing organic products from

start to finish" by making foreign farms untraceable. The way the rule actually works also

contradicts the USDA's public representations concerning "strengthening organic enforcement":

> **What does the rule do?**
>
> SOE protects organic integrity and bolsters farmer and consumer
> confidence in the USDA organic seal by supporting strong organic
> control systems, improving farm to market traceability, increasing
> import oversight authority, and providing robust enforcement of
> the organic regulations.

*See* USDA Jan. 18, 2023 press release.

145.

Summarizing the above, the 2% Rule harms the integrity of the USDA organic seal;

harms the reputation and goodwill of the seal; and, therefore, harms Pratum Farm as a U.S. farm

enterprise that is licensed to use the seal.

**C.     The 2% Rule also creates economic harm**

146.

The 2% Rule also creates an uneven economic playing field in the marketplace that

harms or is likely to harm Pratum Farm.

147.

The U.S. hazelnut industry (conventional and organic) is small, consisting of

approximately 1,000 family farms that are mostly found in Oregon. Turkey dominates world

hazelnut production and, likewise, dominates the U.S. domestic hazelnut market. U.S. hazelnut farmers produce less than 10% of Turkish production.

148.

Consequently, in the conventional market (which is much larger than the organic market), the prices buyers pay for conventional Turkish kernels directly influence and are used to leverage U.S. farmer prices. For example, when selling their crop each year against Turkish competition in the conventional hazelnut industry, U.S. hazelnut processors (who buy hazelnuts from farmers locally and resell them as kernel products) are often faced with selling to one large international corporate buyer (Ferrero - the maker of Nutella) who leverages Turkish market prices for kernels against the prices the buyer is willing to pay for U.S. hazelnuts. The U.S. organic hazelnut market has been able to maintain organic farmer premiums because of smaller buyers that value organic integrity – which operate as a subset of a greater buyer market. However, as of the date of this complaint, the type of Turkish leverage just described is pressuring Pratum Farm's primary buyer (the Albany processor described above) to pay lower farmer prices for organic hazelnuts for the upcoming crop year.

149.

As discussed above, the USITC investigation produced evidence that a Turkish processor/exporter of "organic" hazelnut kernels sold organic kernels from Turkey at a 3% premium over Turkish conventional prices (*See* Ex. A (Bates Nos. PF000005 & PF0000040)) for crop year 2022. A Turkish processor cannot charge a 3% organic premium unless the processor pays little or no organic premium to upstream farmers and has insignificant costs for obtaining organic certificates.

150.

For crop year 2021, two local Oregon processors were paying approximately $1.65 per pound, in-shell, to organic hazelnut farmers. At that time, Pratum Farm was receiving approximately $0.95 per pound as the "conventional" farmer price on Pratum Farm's "in-transition" orchards. The difference between $1.65 and $0.95 is an approximate 70% organic farmer premium that is a significant and direct cost increase for processors as they sell into the downstream organic market – that can only be recaptured by the processor if the processor can likewise charge a significant organic premium to the processor's customers. Therefore, if an Oregon processor has to compete with a Turkish processor who is charging a 3% organic premium over conventional prices in the marketplace, based on the Turkish processor's use of the USDA organic seal, the Oregon processor is under significant pressure to likewise meet the Turkish processor's organic price – which reduces the prices the processor can pay to local Oregon organic farmers like Pratum Farm. As indicated above, this is what is happening in the current marketplace as of the filing date of this Complaint.

151.

In the above traceability description of Pratum Farm's crop passing to the Albany processor, there were multiple levels of certification costs in the chain – that is, Pratum Farm, the commercial dehydrator, and the Albany processor each have to pay a certain amount for organic certification that involves inspections by a third-party, accredited certifier. In the agribusiness model of group certification described above, the processor pays for all the certification costs in return for being the first in the chain to receive the organic "crops" certificate. No one except the processor and certifier knows how much. However, an agribusiness would independently incur significant "internal control system" costs if it actually hired sufficient numbers of personnel to meet the numerous laundry list requirements and criteria set forth in the USDA's training slides

(*see* ¶¶ 70-80, *supra.*). The USITC investigation indicated that Turkish agribusinesses are not doing it. More likely than not, foreign agribusinesses in collaboration with certain corrupt certifiers game the "internal control system" to avoid multiple layers of certification costs for foreign agribusinesses that U.S. farm businesses are paying along the entire farm-to-table chain. It is also a system that makes it very possible for some of these agribusinesses to buy local farmer crops without disclosing to the farmer that the crop is being sold as "organic."

152.

In the name of "strengthening organic enforcement," the USDA/NOP has now written an organic certification scheme that supports corrupt practices and harms U.S. farmers into the Code of Federal Regulations.  The new SOE rule is clearly inconsistent with the requirements of the OFPA inspection statute.

**CLAIM FOR RELIEF**

153.

Pratum Farm re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

154.

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by federal agency action within the meaning of a relevant federal statute, is entitled to judicial review thereof.  5 U.S.C. § 702.

155.

The OFPA did not address grower group certifications when it was enacted in 1990; there have been no statutory amendments to the OFPA since then that address grower group certifications; and the OFPA inspection statute has never changed.

156.

Rules specific to grower groups *(i.e.,* the 2% Rule, and other related new rules specific to "grower group" certifications) were written into the CFRs, for the first time, as part of SOE rule-making that was made effective on March 20, 2023.

157.

It is the stated purpose of the OFPA "to establish national standards…to assure consumers that organically produced products meet a consistent and uniform standard." 7 U.S.C. §6501(2).

158.

The OFPA inspection statute states, in pertinent part:

A program established under this chapter shall—

\*          \*          \*

(5) provide for annual on-site inspection by the certifying agent of each farm and handling operation that has been certified under this chapter;

7 U.S.C. § 6506(a)(5).

159.

The new regulation that embodies the 2% Rule states, in pertinent part:

(a)     ***On-site inspections***.

\*          \*          \*

(2) Inspections of a producer group operation must:

(i) Assess the internal control system's compliance, or ability to comply, with the requirements of <u>§ 205.400(g)(8)</u>.  This must include review of the internal inspections conducted by the internal control system.

(ii) Conduct witness audits of internal control system inspectors performing inspections of the producer group operation.

(iii) <u>Individually inspect at least 1.4 times the square root or 2% of the total number of producer group members, whichever is higher</u>.

All producer group members determined to be high risk by the certifying agent must be inspected. At least one producer group member in each producer group production unit must be inspected.

7 CFR § 205.403(a)(2) (underlining added).

160.

Therefore, the 2% Rule, 7 CFR § 205.403(a)(2) (and related rules that are new), creates an inconsistent standard that is an exception to the farm inspection requirements of the OFPA inspection statute, 7 U.S.C. § 6506(a)(5), without any statutory basis for making the exception. After calling farm inspections by an accredited certifier "vital" for the organic certification of U.S. farmers, the USDA/NOP has developed policies, and now rules, that inspections are "not vital" for foreign agribusiness interests. After making an "organic promise" to the U.S. public that organic food products can be traced directly to farms, the USDA/NOP has developed policies, and now written rules in the CFRs, which make foreign farms untraceable.

161.

The 2% Rule circumvents the intent of the OFPA inspection statute and the OFPA's general goal of assuring U.S. consumers that organically produced products meet a consistent and uniform standard. 7 U.S.C. §6501(2).

162.

The 2% Rule is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" in violation of the OFPA and the APA. 5 U.S.C. § 706(2)(A)&(C).

**RELIEF REQUESTED**

WHEREFORE, Pratum Farm respectfully requests that the Court:

a.      Declare that the USDA's 2% Rule (7 CFR § 205.403(a)(2)) is unlawful under the OFPA;

b.      Declare that any related new regulations, written as part of SOE final rule making for the purpose of carrying out the 2% Rule, are unlawful under the OFPA;

c.      Declare that any organic certifications issued under the 2% Rule, or similar grower group certification policies, are unlawful under the OFPA;

d.      Order the USDA and the NOP Deputy Administrator to instruct accredited certifiers to immediately discontinue the practice of issuing organic certificates for "crops" to any party under the 2% Rule or any equivalent grower group certification practice or policy;

e.      Award Pratum Farm reasonable attorneys' fees and costs associated with this litigation; and

f.      Grant such further and additional relief as this Court deems necessary, just, and proper.

DATED this 17th day of October, 2023.

HUTCHINSON COX

By:    s/Ariana Denley
        Ariana Denley (Ms./she/her)
        OSB #173314
        adenley@eugenelaw.com
        Telephone: (541) 686-9160
        Facsimile: (541) 343-8693
        Of Attorneys for Plaintiff