**Ariana Denley** (OSB #173314)
Hutchinson Cox
940 Willamette Street, Suite 400
Eugene, OR 97401
Tel: (541) 686-9160
Email: adenley@eugenelaw.com

**Bruce A. Kaser** (WSBA #13532)
Vantage Law, PLLC
414 NE Ravenna Blvd., Ste A-1243
Seattle, WA 98115
Tel: (202) 909-7928
Email: bruce@vantagelaw.net
(admitted *pro hac vice*)

*Attorneys for Pratum Farm, LLC*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **PRATUM FARM, LLC,**  <br><br>         Plaintiff,  <br><br>   vs.  <br><br> **UNITED STATES DEPARTMENT OF AGRICULTURE,**  <br><br>         Defendant. | Case No.: 6:23-cv-01525-AA  <br><br> **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

This is Plaintiff Pratum Farm, LLC's ("Pratum Farm") Response to the United States Department of Agriculture's ("USDA") Cross-Motion for Summary Judgment in the above matter.

### ARGUMENT

The controversy between the parties in this matter rests entirely on this Court's interpretation of 7 U.S.C. § 6506(a)(5) (the "OFPA farm inspection statute" or "farm inspection

Page 1 –   PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR
              SUMMARY JUDGMENT

statute") as it relates to the organic certification of groups that include processors or traders, farms, and possibly others ("grower groups" or "grower group certifications").

The USDA's motion is based on issues of waiver, standing, and statute of limitations. This response addresses the waiver and statute of limitations issues, first, because they relate to timeliness. Set forth below is a summary timeline (the bolded dates are the most relevant):

| | **Timeline** |
|---|---|
| Dec. 2001 | 7 C.F.R. Part 205 published as final rule, to become effective on February 20, 2001. 65 Fed. Reg. 80548 (AR_0012). |
| **Oct. 2002** | 2002 National Organics Standards Board ("NOSB") recommendation concerning grower groups (October 20, 2002). AR_0149-0155. |
| Oct. 2006 | Agricultural Marketing Service ("AMS") Administrator refuses certification of grower group (October 27, 2006). (no cite to AR – decision lost). |
| **May 2007** | National Organic Program ("NOP") Deputy Administrator, Barbara C. Robinson, writes interim memorandum (May 2007) to accredited certifiers regarding grower groups. AR_6046. |
| **Nov. 2008** | 2008 NOSB revised recommendation concerning grower groups (Nov. 19, 2008). AR_6016-6026. |
| **Jan. 2011** | NOP Deputy Administrator, Miles McEvoy, writes interim memorandum (Jan. 21, 2011) to accredited certifiers. AR_6047. |
| **Aug. 2020** | Notice of proposed rule amendment to organic regulations, 7 CFR Part 205, published in Federal Register (Aug. 5, 2020). 85 Fed. Reg. 47536 (AR_6514-6570). |
| **Jan. 2023** | Pratum Farm learns about the rule amendment to 7 C.F.R. Part 205, called "Strengthening Organic Enforcement" (January 2023). Kaser Dec. ¶ 19. |
| Oct. 2023 | Pratum Farm files suit against USDA on October 17, 2023. |

The parties do not dispute the following: The Organic Foods Production Act of 1990 ("OPFA") did not mention "grower groups" and grower groups were not codified in the first

Page 2 –   PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

version of the organic rules, 7 C.F.R. Part 205, which became effective in 2001.[1] Grower groups were codified in the regulation, for the first time, as part of USDA rulemaking that commenced in August 2020, leading to the "strengthening organic enforcement" ("SOE") amendment to 7 C.F.R. Part 205. Concerning the central issue of statutory interpretation in this matter, Pratum Farm refers to the SOE amendment as the "2% Rule."

**1. The waiver defense.**

Public comments on the proposed SOE amendment commenced for a period of 60 days following Federal Register notice in August 2020. AR_6514-6570. The window for public comment closed in October 2020. AR_6754-7979.

The USDA correctly states "[t]here is no record of Plaintiff providing any comments to the proposed rule, participating in the agency's listening session or webinar, or otherwise putting the agency on notice of its views on these issues…nor does Plaintiff allege that it took any such action." USDA Br. at 16.

Pratum Farm was not an organic farmer during the time rulemaking occurred. After a 3-year transition period, Pratum Farm did not apply for organic certification until January 2022. Kaser Dec. ¶ 5. Moreover, the USDA makes it clear that organic certification is not automatic upon application; it requires review of documentation and a farm inspection before an organic certificate is issued. Therefore, Pratum Farm was not certified organic until May 12, 2022. Complaint (ECF 1-4) at p. 2 of 118 (PF0000169); Kaser Dec. ¶ 5. Pratum Farm had no

---

[1] *See* USDA Answer, ¶ 155 (ECF 15) ("the OFPA does not specifically mention grower groups"); 85 Fed. Reg. 47567 (August 5, 2020) (AR_6545) ("The current USDA organic regulations do not include specific provisions addressing the certification of grower groups."); and 88 Fed. Reg. 3593 (Jan. 19, 2023) (AR_8063) ("This rule codifies key provisions of the 2002 and 2008 NOSB recommendations on producer group certification…").

Page 3 –   PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR
            SUMMARY JUDGMENT

knowledge of the rule or rulemaking before an NBC Nightly News broadcast reported the SOE amendment in late January 2023. Kaser Dec. ¶ 19.

The USDA's waiver defense is based on citing to "participatory waiver" cases. An Administrative Procedure Act ("APA") case involves a district court's "review" of agency action. 5 U.S.C. § 704. In that regard, the district court sits in the role of a quasi-appellate court of review.

Appellate courts often apply waiver against parties attempting to raise new issues on appeal when they should have raised them in the court below. District courts appear to have adopted a similar concept in APA actions for those parties who participate in rulemaking or similar administrative proceedings before seeking district court review under the APA. In other words, a party is at risk of waiver if it adds new comments or creates new issues in district court that it did not present when it participated in the administrative proceeding below. Participatory waiver is distinctly different from a situation where a party simply did not participate through lack of knowledge.

The essence of the USDA's waiver defense is this: *all* members of the public, now and in the future, have waived their opportunity to seek relief from unlawful aspects of the SOE amendment, because they did not participate in or provide comments about the SOE during the 60-day public comment period. However, there is no authority, statutory or otherwise, for applying the doctrine of waiver in this way.

Pratum Farm stands in the same shoes as any conventional farmer who, in 2024, decides to commence the required 3-year transition process to organic. If that farmer hypothetically chooses to raise issues of lawfulness of the 2% Rule, the farmer's options are probably limited to a court action under 5 U.S.C. §702 *et seq.* or, possibly, a petition to the Deputy Administrator of

Page 4 –   PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR
            SUMMARY JUDGMENT

the National Organic Program ("NOP") for a rule change under 5 U.S.C. §553(e). According to the USDA's waiver defense here, the Deputy Administrator can simply dismiss the farmer's petition out of hand by asserting "waiver," because the farmer did not participate in the earlier rulemaking process that preceded the farmer's knowledge and decision to transition to organic. The USDA can assert likewise if the farmer seeks court review under §702 *et seq.*

The Supreme Court tells us that waiver "is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993). There is no evidence that Pratum Farm intended to relinquish or abandon rights.

While the above should be sufficient to defeat the USDA's waiver defense, there is another reason why waiver does not apply here that relates to notice and public comment that commenced in 2020 as part of SOE rulemaking. That is, the issue of statutory construction raised by Pratum Farm (*i.e.,* interpretation of the farm inspection statute) was predetermined by the USDA before it commenced the rulemaking process or asked for public comment. The USDA requested public comment on three specific issues, only:

> "AMS seeks public comment regarding the certification of grower group operations, including answers to the following questions:
>
> 1.   Should there be limits on gross sales or field sizes of individual grower group members? If yes, please describe these limits.
>
> 2.   Should there be a limit on the maximum number of members allowed in a grower group operation or in a grower group production unit? If yes, please describe these limits.
>
> 3.   Should there be a limit to the geographical distribution of members? This includes limits to the maximum geographical proximity or distance between grower group members, grower group production or gathering areas, or grower group production units within a single grower group operation. If yes, please describe these limits."

85 Fed. Reg. 47570-47571 (AR_6548-6549).

Although the USDA's Federal Register notice offers the public, in general, opportunity to comment on any issue related to the proposed rule, the USDA avoided the Achilles' heel of

Page 5 –   PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR
            SUMMARY JUDGMENT

grower group certifications. That is, and as is now clear from the USDA's opposition to Pratum Farm's motion for summary judgment, the USDA previously interpreted the OFPA to not require any certifier farm inspections in a grower group, so long as a processor member's name is put on the organic certificate. This interpretation, whenever it occurred, has been undisclosed from the time of the initial rule in 2001 until now. There is no reasonable way any member of the general public could have understood the USDA's interpretation of the OFPA farm inspection statute well enough to comment on it, particularly when the USDA consciously and continuously educates the public that every farm is inspected worldwide. As one more example of this, two days following commencement of this action, the Deputy Administrator of the NOP informed a member of the public as follows, in pertinent part:

> "Jennifer, as someone who relies on organically certified food in my kitchen, I found this report from Mark Kastel's OrganicEye deeply disturbing. How can I trust any organic certified product coming from overseas? Why is the USDA National Organic Program still allowing this to happen?
>
> [Link omitted]
>
> It's really sad that someone finally has to file a lawsuit to force the USDA to do something. Why not just do the right thing and fix this so we can trust the organic certification process?"

Kaser Dec. ¶ 29 (email from Mr. Steve Smith to Dr. Jennifer Tucker (October 18, 2023)).

> "When an organic product carries the USDA seal, it means that the farm that produced the organic food, and any business that processed it, followed a strict set of regulatory standards and was certified by USDA-approved organizations. **It means that farms and businesses were inspected at least once a year by a qualified organic inspector**. It means that if someone commits fraud and uses the label on a non-certified product, the Federal government will take action to stop that misrepresentation."

Kaser Dec. ¶ 29 (email response from Dr. Jennifer Tucker to Mr. Steve Smith (October 19, 2023)) (boldface and underlining added).

Last, the USDA implies that waiver falls under the doctrine of administrative exhaustion.

The exhaustion doctrine does not apply here.

Page 6 –    PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In general terms, the doctrine is a principle that requires a party to exhaust administrative remedies before seeking redress in a court of law. The purpose of the doctrine is to allow administrative agencies to address and potentially resolve issues before burdening the courts. *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992). However, the doctrine does not apply in an APA action unless an appeal to the USDA was required by either a statute or a USDA rule that requires a mandatory administrative appeal procedure (with the administrative action also being made inoperative while that appeal procedure is followed). *Darby v. Cisneros*, 509 U.S. 137 (1993). There are no mandatory appeal procedures required of Pratum Farm here. Pratum Farm had the option to petition the Deputy Administrator of the NOP for relief under 5 U.S.C. §553(e), in lieu of bringing the present action, but that is nonmandatory and outside the scope of the exhaustion doctrine. *Id.,* 509 U.S.C. at 147 ("it would be inconsistent with the plain language of § 10(c) for courts to require litigants to exhaust optional appeals as well.").

Even if waiver is not outside the exhaustion doctrine, there are exceptions to the doctrine that are applicable here, such as (1) resort to the administrative remedy may occasion undue prejudice due to an unreasonable or indefinite timeframe for administrative action; (2) an administrative remedy may be inadequate because there is doubt that the agency has the power to grant effective relief; or (3) an administrative remedy may be inadequate because the agency is shown to be biased or has otherwise predetermined the issue before it. *McCarthy,* 503 U.S. 146-148.

Exception (1) applies here given that it took the USDA over 20 years to codify grower group certifications into the regulations. It is time to decide the legal issue that is central to this matter now, *i.e.,* whether the OFPA farm inspection statute requires annual on-site certifier inspection of all farms – in a grower group or otherwise. Exception (3) also applies because it is clear the USDA has predetermined the issue.

It is respectfully submitted that the USDA's waiver defense does not apply here.

**2. The statute of limitations defense.**

The USDA's statute of limitations defense fails for two reasons. First, between the original version of the organic regulations that went into effect in 2001, and the last version that went into effect in 2023, there were no interim policies, or the like, that invoked finality or a change in legal position. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (for an agency action to be "final" the action must mark the "consummation" of the agency's decision making process: and "rights or obligations have been determined"). Second, the 9th Circuit's holding in *Wind River Min. Corp. v. United States*, 946 F.2d 710, 716 (9th Cir. 1991) applies here.

The focal point of the USDA's statute of limitations defense is the following:

"The fact that the 2023 Final Rule codified these longstanding policies in the Code of Federal Regulations for the first time does not permit Plaintiff to challenge the 2002 or 2008 policies through this lawsuit because those policies were first issued and became operative more than six years ago."

USDA Br. at p. 21.

According to the above argument, when the USDA published notice of a rule amendment that codified grower group certifications for the first time, on August 5, 2020 ( 85 Fed. Reg. 47536 (AR_6514-6570)), every member of the public was already time-barred from challenging the lawfulness of the 2% Rule because 2002 and 2008 National Organic Standards Board ("NOSB") recommendations were made more than 6 years earlier.

The above "2002 or 2008 policies" refer not to *binding* "policies" but instead refer to *nonbinding* policy "recommendations" made by the NOSB. The NOSB is a volunteer advisory board created under the Federal Advisory Committee Act of 1972. The NOSB serves in an advisory capacity only, and other than giving advice, has no authority to make binding policies on behalf of the USDA. 5 U.S.C. App. § 2(b)(6).

Page 8 –   PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR
           SUMMARY JUDGMENT

On October 20, 2002, the NOSB issued an initial grower group policy recommendation to the USDA/NOP: "Criteria for Certification of Grower Groups" (the "2002 NOSB recommendation"). The recommendation did not mention the OFPA or the OFPA farm inspection statute and recommended criteria for grower group certifications because they have "historically been used for the certification of cooperatives or groups of producers located in a geographical or social region, whose crops are marketed collectively." AR_149.

Because the 2002 NOSB recommendation was nonbinding, it had no attributes of a final agency determination, nor did it change anyone's legal position. Standing by itself, the recommendation was not something that caused a statute of limitations to run.

The Administrative Record does not show any signs of "consummation" or final agency adoption of the 2002 NOSB recommendation. Instead, in 2006, an AMS Administrator determined that every farm in a grower group must be inspected by an accredited certifier. *See* Pratum Farm's Br. at 14-16 (ECF 25). When that happened, public comments at subsequent NOSB meetings ranged from referring to the AMS decision as creating "an impending crisis if the entire grower group certification system is thrown out the window" (AR_0778) to questioning why the NOP had not adopted the 2002 NOSB recommendation as policy:

> "And, finally, I have three questions. Number one is why hasn't the NOSB recommendation been adopted by the NOP yet?"

Transcript of NOSB meeting (March 27, 2007), TR p. 373, ll. 4-6 (AR_1236).

However, rather than adopt the 2002 recommendation as a "final" USDA policy, the Administrative Record shows something different. In May 2007, following 2007 NOSB meetings, Barbara C. Robinson (the then Deputy Administrator of the NOP) wrote a

Page 9 –   PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

nonpublished interim memorandum ("Robinson Memo") to "All USDA Certifying Agents" that stated:

> "After speaking with the Chair of the NOSB, Andrea Caroe, about grower groups, we have come to the following determination in the National Organic Program, effective immediately:
>
> 1. NOP will do rulemaking to address the concerns that we have in the Program, but
>
> 2. NOP will also collaborate with the Board about this – this will be a topic on the fall meeting agenda for the NOSB.
>
> 3. In the interim, we have the 2002 NOSB recommendation on grower group certification (PDF). We will re-publish this on the website under "Today's News." ACAs are reminded that as long as they use the NOSB recommendation for interim guidance, no enforcement action will be taken by the Program related to grower group certification. The NOSB recommendation is quite detailed in scope.
>
>  As discussed, there may be some areas of the NOP regulations which might be amended, or suggested for amendment, which would require public input through notice and comment rulemaking. NOP will consult with the Board on these areas, prior to drafting rulemaking, but certainly during the rulemaking period."

Robinson Memo (May 2, 2007) (AR_6046).

The Robinson Memo did not state that the NOP adopted the 2002 NOSB recommendation as final policy. Instead, words like "will do rulemaking" and in "the interim," among other statements in the Robinson Memo, show clear agency intent to engage in future final rulemaking that may require public notice and comment. In the meantime, certifiers were told the NOP would take no action against certifiers if they followed the 2002 NOSB recommendation "in the interim." This memorandum lacks finality and did not mark the "consummation" of the agency's decision. It did not cause the statute of limitations to run.

Next, on November 19, 2008, the NOSB followed the above by issuing a second grower group policy recommendation to the USDA/NOP: "Certifying Operations with Multiple

Page 10 –   PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Production Units, Sites, and Facilities under the National Organic Program" (the "2008 NOSB recommendation"). AR_6016-6026. In general terms, the second recommendation called the 2006 AMS Administrator decision "informal" (*e.g.,* AR_6017) and apparently determined the opposite from the AMS decision, *i.e.,* grower group certification "is consistent with the OFPA" (*e.g.,* AR_6016).

The advisory board's recommendation indicated actual analysis of various OFPA statutes, including §§ 6501, 6502(15), 6503(a), 6503(c), 6505(b), 6506(a)(2), and 6513(a) for the purpose of expanding on the 2002 NOSB recommendation. However, with respect to the most important statute (the OFPA farm inspection statute, § 6506(a)(5)), the NOSB merely stated:

> "The statute does not define 'inspection' and the fact that it occurs but once a year indicates that Congress considered the organic inspection to be more a part of the OSP collaboration between the farmer and the certifying agent than as part of the government's policing of the organic label."

AR_6019.

In essence, the NOSB concluded that farm inspections are not required in grower groups because Congress's requirement for farm inspections on a one-year cycle indicates that (according to the NOSB) Congress intended that certifier farm inspections are not a mandatory requirement at all.

Regardless of whether the NOSB's interpretation of "inspection" was proper, the 2008 recommendation has the same problem as the earlier one: it is nonbinding, changes no one's legal position, and therefore is not a final agency determination. Like the above, the 2008 recommendation did not cause the statute of limitations to run.

The Administrative Record shows that the NOP took no action on the 2008 NOSB recommendation until January 2011 when a new NOP Deputy Administrator, Miles McEvoy,

Page 11 –   PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR
            SUMMARY JUDGMENT

wrote a memorandum ("McEvoy Memo") to "Stakeholders and Interested Parties" that states, in part:

> The National Organic Program (NOP) is drafting guidance regarding certification of grower groups and will be requesting public comment before publishing final guidance and possible regulation change. In the interim, accredited certifying agents should use the National Organic Standards Board (NOSB) recommendations of October 2002 and November 2008 as the current policies.

AR_6047.

Although the McEvoy Memo carries the title "Policy Memorandum," the other language in the memorandum like "drafting guidance", "requesting public comment before publishing final guidance", "possible regulation change", and in "the interim", all clearly indicate that the NOP did not adopt the 2008 NOSB recommendation as a final policy. Like the earlier Robinson Memo, the McEvoy Memo had no attributes of finality or change in legal position sufficient to trigger the running of the statute of limitations. The McEvoy Memo states that new rules were coming.

Throughout the series of two NOSB recommendations and two interim memorandums by NOP Deputy Administrators, nothing was made final or caused a change in legal position from 2001 until 2023 when the final rule became effective. Therefore, the statute of limitations on Pratum Farm's challenge to the USDA's interpretation of the OFPA farm inspection statute did not start to run until 2023.

Next, the USDA asserts that the *Wind River* rule does not apply to Pratum Farm because Pratum Farm "has never been subject to the producer group certification policy and does not express any interest in becoming certified as a producer group." USDA Br. at 22. As best understood, it appears the USDA argues that Pratum Farm is not a member of a grower group (which is true), and for that reason alone, *Wind River* does not apply. Pratum Farm's membership

Page 12 –   PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR
            SUMMARY JUDGMENT

in a grower group does not matter. *Wind River* applies if Pratum Farm has standing to challenge the lawfulness of the 2% Rule.

In *Wind River*, the 9th Circuit held:

> "If, however, a challenger contests the substance of an agency decision as exceeding constitutional or statutory authority, the challenger may do so later than six years following the decision by filing a complaint for review of the adverse application of the decision to the particular challenger. Such challenges, by their nature, will often require a more 'interested' person than generally will be found in the public at large."

*Wind River Min. Corp. v. United States*, 946 F.2d 710, 716 (9th Cir. 1991).

Pratum Farm's complaint is based on a claim that the USDA has exceeded statutory authority. The final rule is a regulation of continuing application because the USDA's issuance of organic certificates to grower groups is ongoing.

If the Court finds Pratum Farm has standing to bring this action, *Wind River* also applies to the USDA's statute of limitations defense.

**3. The standing defense.**

The USDA's standing arguments distill to this: the USDA implies that injury to Pratum Farm is caused by third parties who do not follow the law (USDA Br. at 17-18); or Pratum Farm cannot claim injury because the USDA is helping, rather than injuring, by creating regulations "that make the certification process more onerous" (USDA Br. at 18-19).

The Supreme Court has explained the factors required for standing (injury, causation, and redress) in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) and many other cases. Applying these factors to the present case, Pratum Farm's "injury" has two facets, explained below. The injury is otherwise "caused" by the USDA's unlawful interpretation of the OFPA farm inspection statute. Requiring the USDA to follow correct interpretation of the statute is likely to "redress" the injury, for reasons discussed below. *See Lujan*, 504 U.S. at 560-561 (explaining required

elements of standing). The USDA's statutory interpretation, simplified, is that farms do not need to be inspected by an accredited certifier if the farms are grouped with a processor or trader whose name appears on the organic certificate.

Regarding the first facet of Pratum Farm's injury, this litigation has the attributes of a dispute between a trademark licensor and licensee. The USDA admits in pleadings that the USDA organic seal (the "seal") is an official certification mark ("mark") that is owned by the USDA and controlled by the NOP. *See* USDA Answer, ¶ 117 (ECF 15). The USDA also admits in pleadings that Pratum Farm is licensed to use the USDA organic seal. *See* USDA Answer, ¶ 120 (ECF 15).

Pratum Farm has a lawful right to use the seal as a licensee. The good reputation of the seal (aka. "goodwill") is something that travels with it and serves as a benefit to Pratum Farm. If the USDA engages in rulemaking in excess of statutory authority that causes harm to the reputation of the seal, then that is a form of injury to Pratum Farm. *See, e.g., Herb Reed Enterprises, LLC v. Florida Entertainment Management*, Inc., 736 F.3d 1239, 1250 (9th 2013) (Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm); *Stuhlbarg Intl. Sales v. John D. Brush Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm).

Pratum Farm therefore has a personal interest in not seeing the USDA engage in a wrongful statutory interpretation that harms the seal's reputation.[2] It is a matter of the USDA telling the U.S. public one thing (*i.e.,* "every farm" is inspected), but interpreting a statute that

---

[2] Similarly, Pratum Farm has a personal interest in preventing organic ingredients suppliers from using loopholes to import organic hazelnuts into the U.S. that are directly related to the USDA's wrongful statutory interpretation. Kaser Dec. ¶¶ 27-28.

Page 14 –   PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR
            SUMMARY JUDGMENT

creates a completely opposite result (*i.e.,* "no" grower group farms are required to be inspected under the OFPA). It generates public mistrust (*see* Smith-Tucker email exchange, p. 6, *supra.*) and harms the seal's reputation. Doing harm to the seal's reputation is the same thing as doing harm to Pratum Farm as a licensed user of the seal.

The USDA states:

"Organic inspectors play a vital role in ensuring organic integrity."

Complaint, ¶ 128 (ECF 1) (quoting from NOP Instruction "The Organic Certification Process").

"Every operation that applies for organic certification is first inspected on site by a certifying agent. These comprehensive top to-bottom inspections differ in scope depending on the farm or facility. For example, for crops they include inspection of fields, soil conditions, crop health, approaches to management of weeds and other crop pests, water systems, storage areas and equipment."

Complaint, ¶ 129 (ECF 1) (quoting from NOP "Organic 101" series).

"Organic certification requires that farmers and handlers document their processes and get inspected every year."

Complaint, ¶ 134 (ECF1) (quoting from NOP "Organic 101" series).

Two days after this lawsuit was filed, the Deputy Administrator of the NOP continued to tell a member of the public that "[w]hen an organic product carries the USDA seal…[i]t means that farms and businesses were inspected at least once a year by a qualified organic inspector." *See* p. 6, *supra.*

After calling certifier farm inspections "vital" to organic integrity, the opposite truth is that grower group certifications enable the grant of a license to a Turkish hazelnut processor to affix the seal to hazelnuts that it buys from uninspected upstream farms. *See* Kaser Dec. ¶¶ 13-16.

Pratum Farm has standing here because it has the right to benefit from the seal's reputation; damage to the seal's reputation results from the above inconsistences that are caused

Page 15 –   PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

by the USDA's improper interpretation of a statute; and redress is likely if the USDA is required to follow the statute, properly interpreted, because it will help restore the seal's reputation.

Regarding the second facet of injury, it is a matter of what the real economic quarrel is here. It is true that Pratum Farm's complaint includes allegations that third party Turkish processors use grower group certifications to commit fraud. In this respect, it is common sense that creating a system that allows "no" or "very few" farm inspections is likely to create a fraud-friendly environment. However, grower group certifications also impact cost in ways that favor large agribusinesses and, in the case of organic hazelnuts, directly harm Pratum Farm. *See* Kaser Dec. ¶¶ 20-26.

First, there are two sides to grower group certifications. The USDA and *amicus* parties present the well-intentioned side that speaks to "smallholders in low and middle income countries" whose farming is "directly and intentionally environmentally beneficial" but for each of them "individual certification would be too expensive and administratively difficult to secure." *Amicus* Br. at pp. 14-16. However, this creates the misperception that foreign farmers are the ones exporting organic food and the billions of dollars in organic trade cited by the *amicus* parties goes into the pockets of the farmers.

Some grower groups may be legitimate farm cooperatives consisting of farmers, only, who sell their products through the cooperative and receive cooperative dividends. However, the other side of grower group certifications involves the "outgrower model" described in *Group Certification* by the FiBL – a grower group that consists of a large corporate processor who buys from a list of uninspected farmers under the auspices of the processor's "internal control system." *See* FiBL, *Group Certification*, p. 40 (AR_6372). The simple fact of the matter is, on a worldwide basis, no one knows which side is the truest.

Page 16 –   PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR
    SUMMARY JUDGMENT

In Turkey, Turkish hazelnut processors use the "outgrower model" to acquire their licenses to use the USDA organic seal with no, or practically no, incremental increase in cost of goods sold. *See* Kaser Dec. ¶¶ 8-26.

In large operations, grower group certifications create the following situation: a Turkish processor's cost of producing one pound of organic hazelnut kernels for sale and export is about the same as the cost of producing one pound of conventional kernels. The reason this is true is relatively simple to explain.

Arslanturk is one example of a Turkish processor that holds organic grower group certificates and purchases hazelnuts from combined lists of approximately 1,400 farmers. *See* Kaser Dec. ¶¶ 16-17 and 25. If it cost $1,000 to send an accredited certifier to visit each farmer (the certifier's time-based fee for travel to and time spent on the farm), the result would be $1,400,000 added to overall certification costs. *See* Kaser Dec. ¶¶ 22-26. On the face of things, it appears to be cost prohibitive for each one of the 1,400 farmers to individually pay $1,000 against "small plot" farmer income, if the farmers are the ones paying. The grower group solution, originally devised, is to simply do away with certifier visits to farms and, consequently, the $1,400,000 in inspection cost disappears.

However, a certifier still needs to be paid something for issuing a grower group certificate to the processor member of the group, as the "certificate holder." This involves the certifier's time cost in mostly reviewing the processor's organic certification paperwork – that may include an inspection of a processor's facility, etc., but at a processor cost of thousands, not tens of thousands.

Arslanturk reported an approximate annual export of 3,000 metric tons of organic hazelnut kernels from Turkey, which equates to 6,600,000 pounds. *See* Kaser Dec. ¶ 25. In terms

Page 17 –   PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

of cost per pound of hazelnut kernels sold, if Arslanturk pays $10,000 to the certifier for the grower group certificate, the certification cost equates to 15% of one cent ($0.0015) in added cost per pound of kernels sold ($10,000 divided by 6,660,000). If Arslanturk also is not paying significantly higher farm prices to the 1,400 farmers (there is evidence that this is what is happening (*see, e.g.,* Complaint at ECF 1-1, page 27 of 33 (PF0000027)), it explains why Turkish "organic "hazelnut kernel imports are coming into the U.S. at prices that are not significantly higher than conventional prices.

The question is: how does this harm Pratum Farm? In the above example, the direct economic result of the USDA's interpretation of the farm inspection statute is that $1,400,000 in certification costs disappear. If the USDA properly interpreted the statute, that total cost would come back into play, because each one of Arslanturk's 1,400 farms would need to be visited by a certifier and someone would have to pay for it. If Arslanturk, as the agribusiness member of the grower group member pays for it, Arslanturk's incremental cost per pound of kernels sold (attributable to farm inspection cost) increases from $.0015 per kernel pound to about $.21 ($1,400,000 divided by 6,600,000). When hazelnuts are trading in the U.S. in the $3 to $4 range (*See* Kaser Dec. ¶ 11), adding 21 cents to Arslanturk's cost is not prohibitive (on a percentage basis it is 7% of the kernel price at $3; 5.25% if the kernel price rises to $4). Paying certification costs on an individual basis may not be affordable for small plot farmers in a group, but it *is* affordable for the agribusiness processor in the group, if the processor wants to sell "organic," along with the added benefit of having every farm inspected by a certifier. As it is, the processor acquires use of the seal for nothing, relatively speaking, along with no certifier farm inspections.

The 21 cents per pound in the above example is significant because it has an elevating effect on the prices Oregon organic hazelnut processors can negotiate with their buyers when

Page 18 –   PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

competing against Turkish imports; and will likely result in beneficial farm prices for Pratum Farm, and others. This issue is sufficient to create a second basis for standing.

## CONCLUSION

Pratum Farm respectfully requests that the Court deny the USDA's cross-motion for summary judgment.

Dated: March 14, 2024                    Respectfully submitted,

*Pratum Farm, LLC*

/s/ Bruce A. Kaser

**Bruce A. Kaser**
WSB 13532
Tel: (206) 909-7928
Email: bruce@vantagelaw.net

## CERTIFICATE OF SERVICE

I certify that on March 14, 2024, I served or caused to be served a true and complete copy of the foregoing **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** on the party or parties listed below as follows:

☒ Via CM / ECF Filing
☐ Via First Class Mail, Postage Prepaid
☐ Via Email
☐ Via Personal Delivery
☐ Via Facsimile

Anna Deffebach
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Facsimile: (202) 616-8460
anna.l.deffebach@usdoj.gov

Of Attorneys for Defendant

/s/ Bruce A. Kaser

**Bruce A. Kaser**

Page 20 –   PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT