IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

**PRATUM FARM, LLC**,

    Plaintiff,

    v.

**UNITED STATES DEPARTMENT OF AGRICULTURE,**

    Defendant.

Civ. No. 6:23-cv-01525-AA

**OPINION AND ORDER**

_____

AIKEN, District Judge:

    Plaintiff, a small Oregon farm producing organic hazelnuts, sues under the Administrative Procedure Act challenging in part a final rule of Defendant United States Department of Agriculture ("USDA"). Plaintiff asserts injury based on the USDA's organic certification program that allows, in large part, mostly foreign farms to have their products marketed with the USDA certified organic seal without undergoing the yearly, on-site inspection by an accredited certifier as Congress

Page 1 – OPINION AND ORDER

required.  Before the Court are the parties' motions for summary judgment.  The Court cannot reach the merits of Plaintiff's claim because Plaintiff lacks standing.  On those grounds, Plaintiff's Motion for Summary Judgment, ECF No. 12, is DENIED.  Defendant's Cross-Motion for Summary Judgment, ECF No. 20 is GRANTED.

## BACKGROUND

### I.    Historical Background and Rising Demand for Organic Products

Congress enacted the Organic Foods Production Act ("OFPA" or the "Act") in 1990 to "establish national standards governing the marketing" of organically produced agricultural products, to "assure consumers that organically produced products meet a consistent standard[.]" 7 U.S.C. § 6501.  The standards for organic production are prescribed by the statute, *see id.* § 6501 *et seq.*, and further delineated in USDA's implementing regulations, *see* 7 C.F.R. §§ 205.200-205.290.

To ensure that producers comply with national standards, the statute charges the Secretary of Agriculture with establishing a program to certify "producers and handlers" that meet federal requirements.  7 U.S.C. § 6503(a).  Consistent with that mandate, the USDA established the National Organic Program through rulemaking ("Program").  *See* National Organic Program, 65 Fed. Reg. 80,548 (Dec. 21, 2000).  The organic certification process is not performed by the USDA itself, but rather by "certifying agents," which are third parties accredited by the USDA.  *Id.* §§ 6502(3), 6503(d), 6514-6515.  Certifying agents may be either a governing State official or a private person.  *Id.* § 6514.

In the last two decades, both demand for and sales of organic products have skyrocketed. AR 8019. Total sales of organic products in the United States reached more than $63 billon in 2021. *Id*. The number of businesses producing, handling, marketing, and selling organic products have also grown to meet consumer demand. *Id*. Rapid growth—and the financial benefit that comes with marketing products as "organic"—has drawn interested businesses to seek use of the USDA organic label. *Id*.

The USDA has stated that "high demand for organic products, the absence of direct enforcement over some entities in the organic supply chain, and organic price premiums increase the opportunity and incentive for organic fraud (when nonorganic products are deceptively represented as organic)." AR 8020. When earlier organic regulations were published in the year 2000, organic products were marketed mostly locally or regionally, and supply chains tended to be short and transparent; for example, farm to wholesale to retail to consumer. *Id*. Demand and sales have grown considerably since then. *Id*. This significant market growth has attracted more producers, handlers, product suppliers, importers, brokers, distributors, and other businesses to the organic market. *Id*.

Partly in response to the growing risk of fraud to organic integrity, regulatory policy further developed, and enforcement improved. The USDA documented thousands of agricultural operations that had profited millions of dollars from the sale of products granted the USDA certified organic seal, but which, on investigation were found noncompliant with the USDA organic standard. AR 8020-21.

Page 3 – OPINION AND ORDER

In some instances, the USDA offered recertification to those operations if they could be proven to meet USDA organic standards through the USDA accredited certifiers (rather than other international certifier entities). AR 8020. The USDA found that, in some cases, even when operations had been marketing their products as USDA certified organic for years, an accredited certifier could not certify according to USDA standards, despite the operations' best efforts. *Id*. After such investigations, the USDA provided examples of sharp drops in foreign import of certified organic products, which the USDA noted "demonstrates both the magnitude of potential fraud in the market," and how more effective oversight, such as "certification only by USDA-accredited certifying agents" can successfully safeguard the integrity of the USDA organic label. *Id*.

## II.    Statutory Text

The statute authorizing the USDA to establish the Program for organic certification sets up requirements for on-site inspections for farms certified "organic." 7 U.S.C. § 6506(a)(5) (the "inspection statute"). Under the inspection statute, congress required that a Program established under the OFPA shall:

> provide for ***annual on-site inspection by the certifying agent of each farm*** and handling operation that has been certified under this chapter.

7 U.S.C. § 6506(a)(5) (emphasis added).

The OFPA defines "certifying agent" as "any person (including private entities) who is accredited by the Secretary as a certifying agent for the purpose of certifying

a farm or handling operation as a certified organic farm or handling operation in accordance with this chapter." 7 U.S.C. § 6502(3).

Under the Act, a person may only sell or label a domestic agricultural product as organically produced if it has been produced or handled in accordance with the OFPA. *Id.* § 6505. However, these requirements do not apply to "small farmers" which the Act defines as "persons who sell no more than $5,000 annually in value of agricultural products." *Id.* § 6505(d). Additionally, imported agricultural products may be sold or labeled as organically produced if the Secretary determines that such products have been produced or handled under an organic certification program that "provides safeguards and guidelines" that are "at least equivalent to the requirements" of the OFPA. *Id.* § 6505(b).

## III.    Producer Groups (or Grower Groups)

Important here is background on Producer Group Operations (historically known as "grower groups"). AR 8062; Amicus Brief at 9, ECF No. 22-1. "Grower group" is a term of art, meaning a group of farmers or producers in a certain location organized under one management system. 88 Fed. Reg. at 3,593 ("Final Rule*"); see also* Amicus Br. at 9.

First introduced in the 1980s, before existing USDA regulations, the grower group model was used by small organic farming associations and certification bodies to certify as organic products grown by small farmers in low-income countries. *Id.* Under the grower group system, the group itself is certified, not the individual members (farms/farmers). By working collectively as a group, the small farmers

could overcome the financial and administrative barriers to individual organic certification and access international markets. The initial focus of most grower groups was on coffee and cocoa cooperatives with very small-scale, and often producers who lacked ability to read or write, each farming only several acres of land. *Id*. Individual organic certification of each such tiny farm, often in very remote areas, was prohibitive not only in terms of costs, but also due to a lack of administrative and management skill. *Id*. at 10.

Plaintiff alleges, and the record supports that, as time passed, the original farm co-op model became minimized, and what Plaintiff calls an "agribusiness model" became dominant, mostly by large agribusinesses operating in Latin America, Asia, and Africa. Compl. ¶ 31. It is now estimated that about 80% of all organic producers worldwide are not made up of individually inspected farms but are certified in groups. *Id*.; Amicus Br. (citing Florentine Meinshausen et. al., Group Certification 41 RSCH. INST. OF ORGANIC AGRIC. (2019).

## III.    Strengthening Organic Enforcement and the 2% Rule

In 2020, driven in part by the above-described organic market growth and increasingly complex nature of organic supply chains, the USDA issued a notice of proposed rulemaking to amend the USDA organic regulations to strengthen oversight and enforcement of the production, handling, and sale of organic agricultural products. *See* National Organic Program: Strengthening Organic Enforcement, 85 Fed. Reg. 47,536 (Aug. 5, 2020) (AR 6514).

The USDA accepted public comments on the proposed rule and held webinars with the public.  *See* Public Comments on Strengthening Organic Enforcement Proposed Rule relating to "Grower Group" (Sept.-Oct. 2020) (AR_6754-7917); Public Comments on Strengthening Organic Enforcement Proposed Rule relating to "Producer Group" (Sept.-Oct. 2020) (AR_7918-79); USDA, Agricultural Marketing Service, Organic Insider Strengthening Organic Enforcement Proposed Rule Webinar (July 2020) (AR_6696).  On January 19, 2023, the Final Rule was published in the Federal Register. 88 Fed. Reg. 3,548.   In the 2023 rule, the USDA established provisions specific to grower groups.  7 C.F.R. § 205.403(a)(2)(iii).

Relevant here, the Final Rule, in section 205.403(a)(2)(iii), established the mathematical formula governing how many sub-units or producer group members (farms and farmers) the certifying agent must inspect to require inspections of "at least 1.4 times the square root or 2% of the total number of producer group members, whichever is higher." 88 Fed. Reg. at 3,596; 7 C.F.R. § 205.403(a)(2)(iii).  This means, as explained by examples in the Final Rule, in a group with 50 members, at least 10 members must be subject to inspection; in a group with 100 members, at least 14 must be subject to inspection; in a group with 500 members, at least 31 must be subject to inspection; and in a group with 1000 members, at least 44 must be subject to inspection.  88 Fed. Reg. at 3,596.

The remaining members not inspected by a USDA accredited certifier are inspected through an "Internal Control System" ("ICS") by a designated employee of the group, to ensure compliance with the USDA's National Organic Standard.  AR

0150.  The ICS functions similarly to a quality assurance department at a large operation.  The ICS of the grower group must be inspected by the certifying agent at least annually.  AR 0149.  Grower groups "do not easily fit normal inspection protocols" because "[g]rower groups are often very complex" and "may include hundreds if not thousands of producers."  AR_0151.

## IV.    Imported "Organic" Hazelnut Fraudulent Activity

Plaintiff is a hazelnut farm in Salem, Oregon.  Compl. ¶ 5.2 Plaintiff is not a member of a producer group.  In 2019, Plaintiff began transitioning to organic hazelnut operations and currently holds an organic crops certificate for hazelnuts issued by the Oregon Department of Agriculture, an authorized certifying agent under the OFPA.  *Id*.  ¶¶ 5, 119.  This certificate permits Plaintiff to market and sell its products as USDA-certified organic.  Plaintiff sells organic hazelnuts to a local Oregon processor and sells its products directly to the public under the business name "Frankie's Oregon Organic Hazelnuts."  *Id*. ¶ 121.

Plaintiff must pay more for its organic hazelnuts to be processed than for its conventional (non-organic) hazelnuts to be processed.  *Id*. ¶ 136.  Consumers are often willing to pay higher prices for organic products, a so-called "organic premium."  *Id*. ¶¶ 93-94.  In 2022, Plaintiff learned that some Turkish hazelnut processors were selling organic hazelnuts at negligible organic premiums over Turkish conventional hazelnuts.  *Id*. ¶ 91.

Plaintiff reviewed publicly available import records and discovered that Turkish processors are causing the import of substantially greater quantities of

"USDA-certified" organic hazelnut kernels into the U.S. compared to the local domestic production of organic hazelnuts by U.S. farmers. From these records, Pratum Farm identified five (5) Turkish processors who, along with related entities or U.S. importers, were causing these imports. *Id*. ¶ 96. Available information also indicated that all five of the Turkish processors were industrial agribusiness or food factory complexes – one owned by a multi-billion-dollar international agribusiness conglomerate. *Id*. ¶ 97

In response to this information, Plaintiff filed a Complaint with the U.S. International Trade Commission ("Trade Commission") asking that it investigate 5 Turkish hazelnut processors. *See* "In the Matter of Certain Hazelnuts and Products Containing the Same," USITC Investigation No. 337-USITC-1337; *id*. ¶ 102. The Trade Commission investigation revealed that the Turkish processors were engaged in "substantial fraud and noncompliant practices." *Id*. ¶ 104.

The Trade Commission investigation showed that the Turkish Hazelnut operations had fraudulent farmer lists and false buy/sell documentation, and production units listed at addresses, that when visited, turned out to be urban buildings and apartments, far from any farm. *Id*. ¶ 106.

The Trade Commission has limited jurisdiction and no power or authority to administrate organic certifications on behalf of the USDA, usurp the USDA's authority to administrate the organic certification program, or cancel organic certificates issued under circumstances that involve fraud. *Id*. ¶ 105. Therefore, when the Trade Commission investigation revealed that the Turkish import problems

were attributable to USDA administrative practices under the Producer Group program, Plaintiff dismissed the Trade Commission action without prejudice. *Id*. Based on information learned during the Trade Commission investigation, Plaintiff filed a private party Complaint with the USDA Office of Inspector General ("OIG") on July 20, 2023. *Id*. ¶ 108. The July 2023 Complaint asked the USDA OIG to revoke the accreditation of all five of the certifiers who were responsible for the certifications of the Turkish hazelnut processers. *Id*. The USDA OIG referred the Complaint to body administering the Program for review. On October 17, 2023, Plaintiff filed this lawsuit.

## V.    This Litigation

Plaintiff's Complaint brings a single cause of action under the APA, alleging that the regulation governing the certifying agent inspections of producer groups, codified at 7 CFR § 205.403(a)(2), is "'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right' and 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Id*. ¶ 162 (quoting 5 U.S.C. § 706(2)(A) & (C)). On January 2, 2024, Plaintiff moved for summary judgment. ECF No. 12 ("Plf. MSJ").

Specifically, Plaintiff contends that certifying as organic the products of group growers without inspection of *all* member farms by an accredited certifier is a violation of Congress explicit directive that Defendant "provide for annual on-site inspection by the certifying agent of each farm and handling operation that has been certified under this chapter." U.S.C. § 6506(a)(5). Plaintiff also maintains that having

member farms inspected internally by an employee or other person associated with the group creates conflict of interest that could be detrimental to organic integrity.

## LEGAL STANDARD

## I.   STATUTORY LEGAL STANDARDS

The APA authorizes courts to "set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Agency action is arbitrary and capricious if the agency 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *City of Los Angeles, California v. Fed. Aviation Admin.*, 63 F.4th 835, 842 (9th Cir. 2023) (quoting *WildEarth Guardians v. EPA.*, 759 F.3d 1064, 1069-70 (9th Cir. 2014)). The APA "does not allow the court to overturn an agency decision because it disagrees with the decision." *River Runners*, 593 F.3d at 1070. The Court may not substitute its judgment for the agency's and must uphold the decision "if there is a rational connection between the facts that the agency found and its conclusions." *Id.*

Prior to the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, ──── U.S. ────, 144 S. Ct. 2244 (2024), the court would determine whether the agency's interpretation was due deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 694 (1984). However, after *Loper Bright Enterprises*, courts may look to agency interpretations for guidance, but do not defer

to the agency. 144 S. Ct. at 2266–67; *see Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (explaining that, while an agency's interpretation is "not controlling," it may still have "power to persuade" based on "the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements").

## II.    MOTION FOR SUMMARY JUDGMENT STANDARD

The Ninth Circuit has endorsed the use of Rule 56 motions for summary judgment in reviews of agency administrative decisions under the APA, 5 U.S.C. § 701–06. *See, e.g.*, *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994). Under Rule 56, "[t]he moving party is entitled to summary judgment as a matter of law where ... there are no genuine issues of material fact in dispute." *Id.* at 1472. Because the role of the court under APA is not to "find facts" but to review the administrative record to determine whether the federal agency considered the relevant factors and reached conclusions that were not arbitrary and capricious, there can be no genuine issue of material fact, and summary judgment is the appropriate resolution of the case.

## DISCUSSION

In sum, Plaintiff's argument is that the USDA rule permitting Producer Group certification by inspection of 2% of the farms violates the OFPA statutory requirement that each farm being annually inspected by a USDA accredited certifier.

## I.    Waiver

In their cross-motion for summary judgment, Defendant asserts that Plaintiff has waived its challenge to the Final Rule by failing to exhaust the issue before the agency. Defendant frames this argument as a jurisdiction one and maintains: "It is black-letter administrative law that '[a]bsent special circumstances, a party must initially present its comments to the agency during the rulemaking in order for the court to consider the issue.'" Def. Cross-MSJ at 15 (citing *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001)).

Public comments on the proposed SOE amendment commenced for a period of 60 days following Federal Register notice in August 2020. AR 6514-6570. The window for public comment closed in October 2020. AR 6754-7979. Plaintiff admittedly did not submit comments on the proposed rule. Defendant asserts that this bars judicial review.

"As a general rule, [courts] will not review challenges to agency action raised for the first time on appeal." *Portland General Elec. v. Bonneville Power Admin.*, 501 F.3d 1009, 1023 (9th Cir.2007) (citing *Exxon Mobil v. EPA*, 217 F.3d 1246, 1249 (9th Cir.2000)). A party petitioning the court for redress of grievances may waive "their right to judicial review ... [when] they were not made before the administrative agency, in the comment to the proposed rule, and there are no exceptional circumstances warranting review." *Id.* This rule does not foreclose judicial review, but rather is construed as a waiver that may foreclose consideration of specific arguments. *Id.* at 1023–24.

In general, a court "will not invoke the waiver rule in [its] review of a notice-and-comment proceeding if an agency has had an opportunity to consider the issue." *Id*. at 1024 (citing *Natural Resource Defense Council, Inc. v. EPA*, 824 F.2d 1146, 1150–51 (D.C. Cir. 1987) (en banc)). "This is true even if the issue was considered *sua sponte* by the agency or was raised by someone other than the petitioning party." *Id*. (citing *Portland General Electric Co. v. Johnson*, 754 F.2d 1475, 1481 (9th Cir. 1985)). The waiver rule serves to protect the agency's "prerogative to apply its expertise, to correct its own errors, and to create a record for our review." *Id*. (citing *Cal. Energy Res. Conservation & Dev. Comm'n v. BPA*, 831 F.2d 1467, 1475 (9th Cir. 1987)). In addition, unlike a statute that requires administrative exhaustion which would create a jurisdictional issue on appeal, the court may "excuse waiver in exceptional circumstances." *Id*. (citations omitted).

Though Plaintiff did not comment during the notice and comment period, the Court finds the record replete with comments from other stakeholders concerning the rate of accredited certifier inspections of group grower members and about the conflicts of interest and competency issues that may present with internal inspectors. AR 8068-69. The Court finds that Plaintiff has not waived those arguments.

## II      Standing

"As the party invoking federal jurisdiction, the plaintiff[] bear[s] the burden of demonstrating that [it has] standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430-31 (2021). To establish Article III standing, a plaintiff must show that it "suffered or [is] imminently threatened with a concrete and particularized 'injury in

fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff must support allegations of standing "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. At the summary judgment stage, "the plaintiff can no longer rest on 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts.'" *Id*.

Defendant asserts that even if Plaintiff's arguments are not waived, Plaintiff lacks standing to assert them. Def. Cross MSJ at 16. Defendant argues that Plaintiff cannot demonstrate that it has suffered a legally cognizably injury caused by the Final Rule, and that, to satisfy Article III standing, the injury may not be "the result of the independent action of some third party not before the court." *Id*. at 17. Defendant points out that Plaintiff's alleged injury is caused by a Turkish hazelnut producer failing to follow USDA regulations and thereby financially benefiting to Plaintiff's disadvantage.

Plaintiff responds that its injury is not caused by a third party, but by the USDA's unlawful interpretation of the OFPA farm inspection statute. Requiring the USDA to follow correct interpretation of the statute is likely to "redress" the injury. Plf. Resp. at 13.

Plaintiff explains that it is injured in two ways: First, because its injury is akin to that of a trademark licensee, arguing that this litigation has the attributes of a dispute between a trademark licensor and licensee. Plaintiff points to the USDA pleadings where the organic seal (the "seal") is an official certification mark ("mark") that is owned by the USDA and controlled by the Program. *See* USDA Answer, ¶ 117, ECF No. 15. Plaintiff asserts that the USDA also admits in pleadings that Plaintiff is licensed to use the USDA organic seal. *See* USDA Answer, ¶ 120 (ECF 15). Thus, in Plaintiff's view, it has a lawful right to use the seal as a licensee. The good reputation of the seal ("goodwill") is something that travels with it and serves as a benefit to Plaintiff. Plaintiff contends that, if the USDA engages in rulemaking in excess of statutory authority that causes harm to the reputation of the seal, then that is a form of injury to Plaintiff.

Second, Plaintiff contends that its injury results from competition in the organic hazelnut marketplace based on the Turkish hazelnut grower's fraudulent activities, which Plaintiff maintains would not have occurred but-for the USDA rule allowing farms to go without certified inspection.

The Court finds that Plaintiff fails to establish standing because it has not adduced evidence showing that it has suffered or will suffer a legally cognizable injury caused by the Final Rule. To satisfy Article III standing, the injury may not be "the result of the independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167 (1997).

Here, there is a mismatch between the harm Plaintiff purports to suffer and the redress it seeks from the Court. Plaintiff's theory of injury appears to rest on the assumption that the Turkish hazelnut producers' decision to sell their organic hazelnuts at a lower price point injures Plaintiff, but Plaintiff produces no evidence that it has, in fact, suffered such an injury. For example, Plaintiff has not demonstrated that it has in fact incurred loss because of the Final Rule.

Plaintiff alleges that Turkish hazelnut industry competitors are engaging in "fraud and noncompliant practices" which allow them to sell their product at a lower price point. *See* Compl. ¶¶ 86, 93-94, 104. Plaintiff thus attributes its alleged injury to the illegal actions of the Turkish producers. *Id*. ¶ 105. In fact, Plaintiff alleges that an investigation revealed that its competitors were "not comply[ing] with self-inspection or 'internal inspector' requirements under the grower group" certification program. *Id*. ¶ 106; *see also* ¶ 151 ("Turkish agribusinesses are not [complying with USDA requirements]").

Thus, to the extent Plaintiff alleges that it is being placed at a competitive disadvantage, Plaintiff attributes that disadvantage not to the challenged regulation, but to a failure on the part of its competitors to follow the law or a failure on the part of USDA to adequately enforce it. But Plaintiff does not purport to challenge USDA's enforcement discretion, and even if it had, such a challenge would be presumptively unreviewable. *See Heckler v. Chaney*, 470 U.S. 821, 842-43 (1985). Because Plaintiff instead attributes its injuries to the unlawful actions of third parties, not the

challenged regulation itself, Plaintiff has not established that the regulation caused Plaintiff's alleged injuries, nor will Plaintiff's requested relief redress those injuries.

Moreover, Plaintiffs basis for injury as a licensee is speculative. Plaintiff has not pointed to evidence that the reputation of the USDA organic seal has been harmed, in turn injuring Plaintiff. Plaintiff's alleged injury must be concrete and particularized, and not hypothetical. Here, the record shows that the public and producers highly value the USDA organic seal and are willing to pay higher premiums as a result.

Even if Plaintiff could demonstrate that the Final Rule benefitted Plaintiff's competitors in some way, the Supreme Court has rejected the sort of "boundless theory of standing" that Plaintiff relies on here, in which "a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful." *Already, LLC v. Nike, Inc*., 568 U.S. 85, 99 (2013) *see also KERM, Inc. v. FCC*, 353 F.3d 57, 60 (D.C. Cir. 2004) (a party seeking to invoke competitor standing must show "that it is a direct and current competitor whose bottom line may be adversely affected by the challenged government action" (citation omitted)); *PSSI Glob. Servs., L.L.*C., 983 F.3d at 11-12 (holding that "claims that the favorable regulatory treatment of a competitor has caused a skewed playing field" are "insufficient" and plaintiffs must "identify any specific harm . . . that will result as a matter of economic logic.").

Because Plaintiff has failed to adduce evidence that the Final Rule will result in increased competition, causing Plaintiff any injury, Plaintiff lacks standing to

challenge the final rule.  The Court therefore does not reach the merits of Plaintiff's claims.

## CONCLUSION

For the reasons explained, Plaintiff's Motion for Summary Judgment, ECF No. 12, is DENIED.  Defendant's Cross Motion for Summary Judgment, ECF No. 20 is GRANTED based on standing.  No decision on the merits is reached.  This Case is DISMISSED without prejudice, but without leave to replead.

It is so ORDERED this  30th  day of   September   2024

 /s/Ann Aiken
Ann Aiken
District Judge